**UNITED STATES COURT OF APPEALS**

**FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 10, 2007

Charles R. Fulbruge III
Clerk

_____

No. 06-70020

_____

RICARDO ORTIZ,

Petitioner-Appellant,

versus

NATHANIEL QUARTERMAN, DIRECTOR, TEXAS
DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL
INSTITUTIONS DIVISION,

Respondent-Appellee.

Appeal from the United States District Court
For the Western District of Texas

Before SMITH, GARZA, and PRADO, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Texas death row inmate Ricardo Ortiz ("Ortiz") appeals the district court's denial of his 28 U.S.C. § 2254 habeas corpus petition in which he claimed that the Texas retaliation statute was an unconstitutional *ex post facto* law when applied to him. He also moves for a certificate of appealability ("COA") to appeal two additional issues, arguing that reasonable jurists would find debatable whether the trial court improperly excluded a veniremember from jury service because of

her views regarding the death penalty and whether the trial court improperly instructed the jury on the requisite burden of proof for imposition of the death penalty.

I

On August 6, 1997, Ortiz was arrested in El Paso, Texas, for violating the terms of his parole. He told arresting officers that, in exchange for his release from custody, he would give them information about a series of unsolved bank robberies. The officers contacted the F.B.I., who had been investigating the bank robberies and already had suspected Gerardo Garcia ("Garcia") to be the main bank robber. The F.B.I. did not yet know the identity of the get-away driver, but after hearing that Ortiz had special information about the robberies, they suspected Ortiz might be the man for whom they were looking. By the time the F.B.I. arranged to speak with him, however, Ortiz had changed his mind and refused to talk. In light of Ortiz's refusal, the F.B.I. scheduled an interview with Garcia, who was already in the custody of El Paso police, hoping that Garcia would name Ortiz as the get-away driver.

When Garcia, too, refused to talk, the F.B.I. concocted a plan that it hoped would convince Ortiz to implicate Garcia, and vice versa, in the bank robberies. Agents scheduled a second interview with Garcia and arranged for Ortiz to be brought past the interrogation room so that the two men could see each other and make eye contact. The F.B.I. hoped that each would assume his accomplice was cooperating with investigators and would do the same. When neither suspect was forthcoming with incriminating information, however, agents drafted a federal arrest warrant for Garcia on bank robbery charges and attached a probable cause statement that falsely mentioned Ortiz as one of the individuals implicating him. The F.B.I. showed Ortiz the probable cause statement and warned Ortiz that Garcia would be shown the warrant and would learn that Ortiz had "snitched him off," implying

-2-

that Garcia might then retaliate by implicating Ortiz.

When neither suspect would talk about the robberies, Ortiz and Garcia were placed in the same tank in the El Paso Detention Center. This unit was reserved for members of the Texas Syndicate, an aggressive and violent gang notorious for its rigid hierarchy and ruthless intolerance of disloyalty. Ortiz was a high-ranking officer of the Texas Syndicate and "tank boss" of this unit.

On August 19, 1997, Garcia was found dead in the bed of his jail cell. An autopsy revealed that Garcia died of a heroin overdose, one so high that it was three times greater than the amount sufficient to cause death. There were fresh needle marks and bruises on his left arm, but no needle track marks, indicating that Garcia probably was not a heroin addict. Prison witnesses revealed that Ortiz had obtained heroin the evening before Garcia was found dead and, that night, had injected Garcia with the syringe. Ortiz's cellmate revealed that Ortiz had told him that Garcia "must die" for implicating him in the bank robberies that he and Garcia had committed together.

Ortiz was indicted by a Texas grand jury with "intentionally caus[ing] the death of an individual, namely, Gerardo Garcia, by injecting Gerardo Garcia with heroin . . . then and there in the course of committing and attempting to commit the offense of retaliation against Gerardo Garcia." The retaliation component elevated Garcia's murder to a capital offense. *See* TEX. PENAL CODE § 19.03(a)(2) (Vernon 1997).[1]

On June 16, 1999, the jury found Ortiz guilty of capital murder. During the punishment phase, Ortiz did not present any mitigating evidence. Ortiz was sentenced to death, and his conviction and sentence were affirmed on direct appeal. *Ortiz v. State*, 93 S.W.3d 79 (Tex. Crim.

---

[1] Texas Penal Code § 19.03(a)(2) defined capital murder as murder and "intentionally commit[ting] the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated sexual assault, arson, obstruction or retaliation, or terroristic threat . . . ."

App. 2002), *cert. denied*, 538 U.S. 998 (2003).

Ortiz timely filed a state petition for a writ of habeas corpus. Deciding that a hearing was unnecessary, the state habeas court entered findings of fact and conclusions of law recommending that all relief be denied. The Texas Court of Criminal Appeals ("TCCA") denied relief in an unpublished order based on those findings and conclusions and its own review of the record. *Ex parte Ortiz*, No. 54,488-01 (Tex. Crim. App. 2003) (per curiam) (unpublished order). Ortiz filed a federal habeas petition asserting seven claims for relief, including the three presented in the instant appeal and application for COA. The district court denied Ortiz's claims but granted a COA for us to decide whether the Texas retaliation statute is an unconstitutional *ex post facto* law as applied to Ortiz. *Ortiz v. Livingston*, 420 F. Supp. 2d 670, 673 (W.D.Tex. 2006). Ortiz now appeals that decision and also petitions this Court for a COA to appeal two additional issues.

II

We first address Ortiz's *ex post facto* claim. We review the district court's findings of fact for clear error and review its conclusions of law *de novo*, applying the same standard of review to the state court's decision as the district court. *Thompson v. Cain*, 161 F.3d 802, 805 (5th Cir. 1998). We review questions of constitutional law, including the constitutionality of a State statute, *de novo*. *United States v. Guidry*, 456 F.3d 493, 506 (5th Cir. 2006). Under AEDPA, Ortiz is not entitled to federal habeas relief unless the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

-4-

28 U.S.C. § 2254(d).

Whether Texas's retaliation statute violates the *Ex Post Facto* Clause, U.S. CONST. art. I, §10 ("No State shall ... pass any ... ex post facto Law ..."), when applied to Ortiz is a question of law and, accordingly, is governed by section 2254(d)(1). *See Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001). A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by th[e Supreme] Court on a question of law or if the state court decides a case differently than th[e Supreme] Court has on a set of materially indistinguishable facts." *(Terry) Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A decision involves an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413.

Ortiz's *ex post facto* claim concerns the change in the crime of "retaliation" between the time of Garcia's murder and the time Ortiz was tried. On the day of Garcia's murder, August 19, 1997, Texas defined the crime of "retaliation" as "intentionally or knowingly harm[ing] or threaten[ing] to harm another by an unlawful act: in retaliation for or on account of the *service* of another as a public servant, witness, prospective witness, informant, or a person who has reported or who the actor knows intends to report the occurrence of a crime." TEX. PENAL CODE § 36.06(a)(1) (effective Sept. 1, 1994 through Sept. 1, 1997) (emphasis added). Texas amended its retaliation statute to take effect on September 1, 1997, only a few days after Garcia's alleged murder. In contrast to the pre-amendment statute which specified only "service," the amended statute criminalizes harming or threatening to harm another for his "*service or status*" as one of those named persons. *Id.* §

36.06(a)(1) (effective Sept. 1, 1997) (emphasis added).[2] The indictment did not include a particular version of the retaliation statute; the document simply charged Ortiz with murder in the course of retaliation. The trial judge, though, instructed the jury with the amended definition of retaliation rather than the definition in effect at the time of the offense.[3]

Although he did not object to the charge during trial, Ortiz challenged the jury instruction on direct appeal, arguing that jury instructions that included the amended version of the statute violated the *Ex Post Facto* Clause. The TCCA rejected Ortiz's claim on two grounds. First, the TCCA concluded that the *Ex Post Facto* Clause "is directed at the Legislature, not the courts," and, as a result, "an ex post facto problem does not arise from a trial court's erroneous retroactive application of a statute, but only if the statute itself has retroactive effect." *Ortiz*, 93 S.W.3d at 91 (citing *Rogers v. Tennessee*, 532 U.S. 451, 457-62 (2001); *Johnson v. United States*, 529 U.S. 694, 701-02 (2000)). Therefore, the court held that "in order to prevail on his *ex post facto* claim, Ortiz would have to

---

[2] The amended statute in full reads: "intentionally or knowingly harm[ing] or threaten[ing] to harm another by an unlawful act: (1) in retaliation for or on account of the *service or status* of another as a (A) public servant, witness, prospective witness, or informant; or (B) person who has reported or who the actor knows intends to report the occurrence of a crime . . . ." TEX. PENAL CODE § 36.06(a)(1) (effective Sept. 1, 1997) (emphasis added).

[3] At trial, the jury was instructed:

As to the law of capital murder and murder, our law provides that a person commits murder when he intentionally or knowingly causes the death of an individual. A person commits capital murder when such person intentionally commits the murder the course of committing or attempting to commit the offense of retaliation.

As to the law of retaliation, our law provides that a person commits an offense if he intentionally or knowingly threatens to harm another by an unlawful act in retaliation for, or on account of, *the service or status* of another, A, as a prospective witness; or B, a person who has reported or who the actor knows intends to report the occurrence of a crime. (emphasis added).

-6-

show that § 36.06 itself operates retroactively, rather than [merely showing] that the trial court retroactively applied it. He does not do so." *Id.* Second, the TCCA held that, although the jury instruction did not violate the *Ex Post Facto* Clause, "the trial court's charge to the jury was erroneous because it relied on the wrong version of the statute." *Id.* However, because Ortiz failed to object to the jury instruction, the TCCA reviewed the trial court's error for only "egregious harm," *id.* at 91-92, and held that Ortiz was not sufficiently harmed to warrant reversal of his conviction. The TCCA explained:

> The evidence supports a conclusion that Ortiz murdered Garcia due to either his status or his service as a prospective witness . . . . With the other options in the statute—public servant, witness, and informant—there is a clear difference between that person's status versus his service. But with a "prospective witness," the line is blurred, since the word "prospective" denotes a future event. There is little difference between a prospective witness' status and his service. As a result, we cannot conclude that Ortiz was egregiously harmed by the erroneous charge.

*Id.* at 92.

On one occasion, in a case cited by neither party, the Supreme Court was presented with a question of whether jury instructions violated the *Ex Post Facto* Clause.[4] *See Splawn v. California*, 431 U.S. 595 (1977). The defendant-petitioner in *Splawn* was convicted under California law of selling obscene materials. *Id.* at 596. Pursuant to a statute that the California legislature enacted after the petitioner's unlawful conduct but before trial, the trial judge instructed the jury to consider "the circumstances of sale and distribution, and particularly whether such circumstances indicate that the matter was being commercially exploited by the defendants for the sake of its prurient appeal." *Id.* at 597. Accordingly, the Supreme Court observed that the newly-enacted statute did "not create any

_____

[4] We note that challenges to the accuracy of jury instructions generally are raised as due process violations. *See e.g.*, *Middleton v. McNeil*, 541 U.S. 433, 437 (2004). We do not address due process, however, because the parties have not raised it.

new substantive offense, but merely declare[d] what type of evidence may be received and considered." *Id*. at 600. Thus, the petitioner's challenge was limited to whether "a change in procedural rules governing his trial amount[ed] to the enactment of an ex post facto law." *Id*. Relying on a decision of the California Court of Appeal, the Supreme Court found that such evidence had been admissible prior to the enactment of the statute and thus found "it unnecessary to determine whether if [the statute] had permitted the introduction of evidence which would have been previously excluded under California law, the petitioner would have had a tenable claim under the Ex Post Facto Clause of the United States Constitution." *Id*. at 600-01. In the absence of a Supreme Court decision determining whether jury instructions violated the *Ex Post Facto* Clause, we cannot hold that the TCCA's rejection of Ortiz's *ex post facto* claim was contrary to or an unreasonable application of clearly established Supreme Court precedent.[5]

Even if we were to entertain Ortiz's *ex post facto* challenge, we still would conclude that he is not entitled to habeas relief. Under the *Ex Post Facto* Clause, Ortiz must prove that the law,

---

[5] We reach no conclusion as to whether the TCCA erred in holding that "an *ex post facto* problem does not arise from a trial court's erroneous retroactive application of a statute, but [rather] only if the statute itself has retroactive effect." We note, however, that the Supreme Court has entertained *Ex Post Facto* Clause challenges premised on a trial court's retroactive application of a statute to acts completed before the statute's effective date. *See Weaver v. Graham*, 450 U.S. 24, 31 (1981) ("[I]t is the effect, not the form, of the law that determines whether it is *ex post facto,*" and a statute may violate the *Ex Post Facto* Clause when applied to a defendant, even if "on its face, it applies only after its effective date.")*; Carmell v. Texas*, 529 U.S. 513, 530-33 (2000) (concluding that the trial judge's application of an amendment to a statute, which authorized conviction of certain sexual offenses on the victim's testimony alone, to offenses committed before the statute's effective date was unconstitutional in violation of the *Ex Post Facto* Clause); *Collins v. Youngblood*, 497 U.S. 37, 39 (1990) (entertaining an *ex post facto* challenge when the court denied the defendant's habeas petition based on a Texas statute passed after the respondent's crime); *Miller v. Florida*, 482 U.S. 423, 435-36 (1987) (holding that the trial court's ruling that revised sentencing guidelines applied to the petitioner, whose crimes occurred before their effective date, violated the *Ex Post Facto* Clause). None of these challenges, however, concerned jury instructions.

retroactively applied to him, caused him some disadvantage. *See Weaver v. Graham*, 450 U.S. 24, 29 (1981) ("[F]or a criminal or penal law to be *ex post facto*[,] it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it."). Ortiz cannot make this showing. As far as Ortiz is concerned, the law as explained in the jury instructions was no different from the law that existed at the time of Garcia's murder because the amendment had no effect on Ortiz. *See, e.g., Dobbert v. Florida*, 432 U.S. 282, 300 (1977) (explaining that the change in law must have also had a specific "effect on the defendant in the proceedings of which he complains").

The pre-amendment version of the statute criminalized harming another on account of his *service* as a public servant, witness, prospective witness, informant, or a person who has reported or who the actor knows intends to report the occurrence of a crime. The amended statute criminalizes harming another on account of his *service or status* as one of these named persons. Ortiz was charged only with retaliating against "a prospective witness" or a "person who has reported or who the actor knows intends to report the occurrence of a crime." He was not charged with committing retaliation against those other named persons—"public servant," "witness," or "informant."

Ortiz argues that rendering "service" requires a prospective witness to take steps toward testifying and that Garcia never performed any "service" because he never provided information to the authorities. Any distinction, however, does not turn on the definitions of "status" and "service," but rather on the definition of "prospective witness." As the TCCA explained:

> With the other options in the statute—public servant, witness, and informant—there is a clear difference between that person's status versus his service. But with a "prospective witness," the line is blurred, since the word "prospective" denotes a future event.

*Ortiz*, 93 S.W.3d at 92. At the time of Garcia's murder, Texas law clearly did not require a person to take steps toward testifying to be considered a "prospective witness;" one "serve[d]" as a prospective witness by acquiring knowledge of the criminal activity. *Morrow v. State*, 862 S.W.2d 612, 614-15 & n.3 (Tex. Crim. App. 1993) (holding that prospective witnesses include "every conceivable category of persons with information regarding criminal activity"). Thus, a person with the "status" of a prospective witness already "serves" as a prospective witnesses by acquiring knowledge of criminal activity. *Id.* At the time of his murder, Garcia allegedly possessed knowledge of Ortiz's criminal activity, and law enforcement had placed him in a position to acquire further knowledge of such criminal activity. Therefore, as the district court concluded, "[t]he amended version of the retaliation statute did not criminalize previously innocent conduct, because murdering Garcia in retaliation for his perceived or expected cooperation with authorities would have been an offense under either version of the statute." *Ortiz*, 420 F. Supp. 2d at 726.

In sum, the Supreme Court has never held jury instructions to be unconstitutional under the *Ex Post Facto* Clause. Even if there were such a decision, Ortiz's *ex post facto* claim cannot prevail because the amended version of Texas's retaliation statute did not change the definition of retaliation as applied to Ortiz. Accordingly, it was not unreasonable for the TCCA to deny Ortiz's claim.

III

We next address Ortiz's petition for a COA. We grant a COA only when the petitioner has made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard requires Ortiz to demonstrate that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327

(2003). In considering a COA, we do not give full consideration to the factual or legal bases in support of the petitioner's claims. *Id.* at 336. Rather, we conduct an overview of the issues presented and a general assessment of their merits under the deferential standard of 28 U.S.C. § 2254(d). *Id.*; *accord Tennard v. Dretke*, 542 U.S. 274, 282 (2004) ("The petitioner's arguments ultimately must be assessed under the deferential standard required by 28 U.S.C. §2254...").

A

First, Ortiz petitions for a COA to appeal the district court's denial of his claim that the trial court erred in granting the State's challenge for cause to Anna Doporto ("Doporto"), a member of the venire, because she voiced opposition to the death penalty.[6] Ortiz argues that Doporto's exclusion from the jury violated his Sixth and Fourteenth Amendment rights as set out by the *Witherspoon-Witt* rule. *See Wainwright v. Witt*, 469 U.S. 412, 424 (1985); *Witherspoon v. Illinois*, 391 U.S. 510, 521-22 (1968). Under this line of cases, a veniremember may not be excluded from sitting on a capital jury simply because she voices general objection to the death penalty or expresses conscientious or religious scruples against its infliction. *See Witherspoon*, 391 U.S. at 521-22. However, a veniremember may be excluded for cause when her views on the death penalty would "prevent or substantially impair the performance of h[er] duties as a juror in accordance with h[er]

---

[6] In the district court, Ortiz claimed that the trial court erred in excluding eighteen other veniremembers for cause. The district court found that this claim was procedurally defaulted in state court for failure to object to each veniremember's exclusion. *See Ortiz v. Livingston*, 420 F. Supp. 2d at 688-691; *see also Ortiz v. State*, 93 S.W.3d at 88 ("A party must object to the granting of a challenge for cause before he can complain of that action on appeal. Because Ortiz failed to object, his complaints were not preserved with respect to all the challenges except for the complaint raised [regarding Doporto].") (footnotes omitted). To the extent Ortiz suggests that these eighteen veniremembers improperly were excluded, we reject his argument for failure to brief the district court's conclusion that these claims were procedurally defaulted. *See Hughes v. Johnson*, 191 F.3d 607, 613 (5th Cir. 1999).

-11-

instructions and h[er] oath." *Witt*, 469 U.S. at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). Whether a juror is excludable under the *Witherspoon-Witt* standard is a question of fact. *See Witt*, 469 U.S. at 423-24 (citing *Patton v. Yount*, 467 U.S. 1025, 1036 (1984)). Accordingly, the TCCA's determination of this claim "shall be presumed to be correct," 28 U.S.C. § 2254(e)(1), and Ortiz "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.; see also Witt*, 469 U.S. at 412-13. We thus examine the context surrounding Doporto's exclusion to determine whether the trial court's determination that Doporto's beliefs would "substantially impair the performance of her duties as a juror" is belied by "clear and convincing evidence."

During *voir dire*, but prior to individual questioning on this point, the trial court spoke to the entire venire, including Doporto, saying:

> I am now going to ask you some questions about your convictions regarding the death penalty. Be assured that I am not now assuming that you will find the defendant guilty of capital murder or of any other crime in this case. Nevertheless, it is necessary to learn your state of mind about capital punishment in general, to determine whether you have an open mind as regards [to] what might be a just and proper sentence in a capital case if the defendant in that case is found guilty as charged.

> So I am asking about your state of mind regarding capital murder in general. I am not asking in this next question what you think would be a just penalty in this or any particular case. I'm not at this time even asking you about your opinion as regards the death penalty in a retaliation capital murder case. And I am most especially not asking what you might think would be a just verdict in this case—in this particular case. I am asking, rather, whether for religious or philosophical or any other reason you believe that the death penalty should never be inflicted in any case, regardless of what the evidence might be.

> In answering this next question, keep in mind that the circumstances and motives for the commission of crimes, including capital murder, are unlimited. Place a check mark by your answer, yes or no. Do you have conscientious scruples in regard to the infliction of death for a person convicted of capital murder? Yes or no?

If you answered the proceeding [sic] question yes, come up to the bench now.

Doporto was one of several veniremembers who identified themselves as having significant conscientious scruples against the death penalty. She approached the bench, and the following exchange ensued:

Ms. Doporto: Number 88, Anna Doporto. I have seen other murder cases and have agreed with the death penalty, but I don't feel I could bring a death penalty for somebody, to put that pressure on me.

The Court: Ma'am it's not a question right now of how you feel about your serving as a juror. Right now, are you opposed to the death penalty in all cases?

Ms. Doporto: No, sir.

The Court: Could you ever, sitting as a juror, no matter—no matter what the evidence showed, vote to inflict the death penalty?

Ms. Doporto: No, sir.

The Court: Anybody want to ask a further question[?]

Neither the State nor the defense accepted the trial court's invitation to ask additional questions. The State then moved to exclude Doporto for cause, the judge granted the State's motion, Ortiz's counsel objected, and the judge overruled the objection.

On direct appeal, the TCCA rejected Ortiz's claim that Doporto had been improperly excluded for cause because of her views on capital punishment. Applying the *Witherspoon-Witt* standard, the TCCA concluded:

The trial court's question to Deporto [sic], asking whether she could vote to inflict the death penalty, was not clearly worded, and any answer to that question, in isolation, would be inconclusive on the question of whether a prospective juror is challengeable under *Witt*. However, the trial court had earlier phrased the issue clearly and correctly . . . , and the question directed specifically at Deporto [sic] was

-13-

asked in the context of a juror who had already expressed doubt about her ability to personally assess the death penalty. A prospective juror is challengeable for cause under *Witt* if she could never personally impose the death penalty, regardless of the facts of the case, even though she might support imposition of the death penalty in the abstract or if someone else imposed it. Although the trial court's question to Deporto [sic] was ambiguous, the record in this case was sufficient for the trial court to believe that Deporto [sic] could never personally vote in such a manner that the death penalty would be assessed. The trial court did not abuse its discretion in granting the State's challenge for cause.

*Ortiz*, 93 S.W.3d at 90.

On federal habeas review, the district court also denied relief out of deference to the state trial court's determination that Doporto was unwilling to impose the death penalty even when the law or facts called for it. The court explained: "whether a particular member of the jury pool is or is not biased and therefore properly seated on the jury is a question of fact based on the trial judge's on-the-spot assessment of credibility and demeanor," and the TCCA's "decision did not represent an unreasonable determination of the facts in light of the evidence before it." *Ortiz*, 420 F. Supp. 2d at 699, 700.

On this record, we do not find the district court's conclusion to be debatable or wrong. The TCCA identified and applied the correct *Witherspoon-Witt* rule and deferred to the trial court's assessment of Doporto's inability to apply the law of capital punishment. The TCCA's decision to defer to the trial court is not an unreasonable application of law, as the Supreme Court has explicitly held that "[s]uch determinations [are] entitled to deference even on direct review; 'the respect paid such findings in a habeas proceeding certainly should be no less.'" *Witt*, 469 U.S. at 428 (internal quotations and citations omitted).

Ortiz's argument that the colloquy between the trial judge and Doporto was too ambiguous to support the trial court's decision is unavailing. Doporto was asked if she could "ever, sitting as

-14-

a juror, no matter—no matter what the evidence showed, vote to inflict the death penalty," and she replied "No, sir." Her answer supports the trial court's finding of "substantial impairment" under *Witt*. Even though Doporto gave conflicting signals of her ability to serve on the jury given her opposition to capital punishment—she seemed to both "agree[] with the death penalty" in some cases but did not "feel" that she could impose it herself—ambiguity alone does not undermine the trial court's decision to exclude her. Rather, "the trial court, aided as it undoubtedly [is] by its assessment of [the veniremember's] demeanor, [is] entitled to resolve [ambiguity] in favor of the State." *Uttecht v. Brown*, 127 S. Ct. 2218, 2223 (2007) (quoting *Witt*, 469 U.S. at 434); *see also Darden v. Wainwright*, 477 U.S. 168, 178 (1986) ("[Even when t]he precise wording of the question asked of [the veniremember], and the answer he gave, do not by themselves compel the conclusion that he could not under any circumstance recommend the death penalty," the need to defer to the trial court remains because so much may turn on a potential juror's demeanor.); *Ruiz v. Quarterman*, 460 F.3d 638, 646 (5th Cir. 2006) (observing that the trial judge sees the juror's demeanor, which is oftentimes more indicative of the real character of the [juror's] opinion, but demeanor "cannot always be spread upon the record.").[7]

We also reject Ortiz's contention that the wording of the questions asked Doporto during *voir dire* did not correctly state the relevant legal standard under *Witt*. Ortiz takes issue with the fact that the trial court, at one point, asked the entire venire: "do you have conscientious scruples in regard to the death penalty?" Under *Witherspoon*, this is an impermissible reason for excluding

---

[7] We note, however, that "[t]he need to defer to the trial court's ability to perceive jurors' demeanor does not foreclose the possibility that a reviewing court may reverse the trial court's decision where the record discloses *no basis* for a finding of substantial impairment." *Uttech*, 127 S.Ct. at 2230 (emphasis added). We deny a COA on this claim because there was a basis in the record for finding substantial impairment.

veniremembers from the jury. 391 U.S. at 520-21. He also asserts that the trial court erred by not expressly asking Doporto whether her views would prevent or disable her from answering the statutory mitigation questions regarding the death penalty honestly.

Clearly established law, however, does not mandate precise *voir dire* questions, as "determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." *Witt*, 469 U.S. at 424. Contrary to Ortiz's contentions, the Supreme Court previously has held that a line of questioning virtually identical to the questioning in this case was an acceptable means to determine whether a veniremember should be excluded under the *Witherspoon-Witt* standard. In *Darden v. Wainwright*, a juror was excluded properly for his affirmative answer to "Do you have any moral or religious, conscientious moral or religious principles in opposition to the death penalty so strong that you would be unable without violating your own principles to vote to recommend a death penalty regardless of the facts?" 477 U.S. at 178. This colloquy is hardly different from Doporto's affirmative answer to "Could you ever, sitting as a juror, no matter—no matter what the evidence showed, vote to inflict the death penalty?" Moreover, the circumstances surrounding Doporto's questioning show that she understood that she was to answer whether she would be able to follow the law in spite of her views on the death penalty.[8] *See id.* During *voir dire*, prior to the questioning specific to the death penalty, the trial judge instructed the venire on how they were to answer questions on their role in applying the law:

---

[8] Ortiz contends that Doporto reasonably could have understood the trial judge's question to have meant whether she would be willing to vote for the death penalty "no matter what the evidence showed" or, in other words, whether she would always vote for the death penalty. Not only is this interpretation far-fetched, but as explained below, the entire colloquy, viewed as a whole, reveals that a juror must have understood the opposite—whether Doporto would have been unwilling to vote for the death penalty, even if it were mandated by the facts.

There are certain rules of law that the Court—that means the Judge—instructs every juror to obey in every criminal case. To be qualified to serve as a juror, a person must be able to obey those instructions. Now, a person may not be able to obey the instruction because he has such a deep-seated disagreement with the law or for any other reason. [But] the jury has to be able to accept the law and say, All right, I don't like it, but I can rule according to it, judge the case according to it. Or you can say, I don't like it so much there's no way I can follow that law.

The trial court also explained the eight circumstances under which murder becomes capital murder in Texas, and detailed the "special issues" questions that would be asked during sentencing if the jury were to find the defendant guilty. It was in this context—after being instructed on the importance of separating one's personal beliefs from applying the law and after being told the mitigation facts that must be found during capital sentencing—that Doporto was asked whether she could ever vote for the death penalty. Like the veniremember in *Darden*, Doporto "was present throughout an entire series of questions that made the purpose and meaning of the *Witt* inquiry absolutely clear," 477 U.S. at 178, and we thus defer to the trial judge's determination of Doporto's capabilities under that standard.[9] Accordingly, reasonable jurists would not debate the district court's decision.

B

Second, Ortiz petitions for a COA to appeal the district court's denial of his claim that the Supreme Court's decisions in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002), render the Texas death penalty sentencing scheme unconstitutional because the scheme does not require the State to prove beyond a reasonable doubt the absence of those mitigating factors that would warrant life imprisonment rather than a death sentence. Ortiz did not present any mitigating evidence during sentencing, but he challenges the mitigation "special issue" that was asked

_____

[9] Also probative is Ortiz's counsel's decision not to question Doporto, which deprived reviewing courts of additional factual findings that may have further explained the trial court's decision or indicated that Doporto was not substantially impaired. *Uttech*, 127 S.Ct. at 2229.

-17-

of the jury:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.

*See* TEX. CODE CRIM. PROC. ANN. art. 37.071 § 2(e) (Vernon 1999). Texas law does not assign a burden of proof to the mitigation question, and Ortiz asserts that the lack of a beyond-a-reasonable-doubt instruction is constitutional error.

The TCCA rejected Ortiz's claim based on *Williams v. State*, 937 S.W.2d 479 (Tex. Crim. App. 1996), which held that "[b]ecause Texas law imposes the burden of proof upon the State to prove certain prescribed aggravating elements, a burden of proof need not be prescribed for aggravating circumstances that might be considered in conjunction with Texas' open-ended mitigation issue." *Id.* at 491. The district court concluded that the TCCA's decision was not unreasonable when neither *Apprendi,* nor *Ring,* nor any other Supreme Court case requires a burden of proof for the absence of mitigating factors presented during sentencing. *Ortiz v. Livingston*, 420 F. Supp. 2d at 728.

We decided this question in *Scheanette v. Quarterman*, 482 F.3d 815, 828 (5th Cir. 2007). The Texas death penalty scheme does not violate *Apprendi* or *Ring* by failing to require the State to prove beyond a reasonable doubt the absence of mitigating circumstances. *Id.*; *see also Granados v. Quarterman*, 455 F.3d 529, 536 (5th Cir.), *cert. denied*, 127 S.Ct. 732 (2006).

IV

For the foregoing reasons, we AFFIRM the judgment of the district court DENYING habeas

relief, and we DENY the application for a COA.