# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 13, 2009

Charles R. Fulbruge III
Clerk

No. 08-70009

KEVIN SCOTT VARGA

Petitioner-Appellant

v.

NATHANIEL QUARTERMAN, DIRECTOR, TEXAS DEPARTMENT OF
CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

Respondent-Appellee

Appeal from the United States District Court
for the Northern District of Texas
(05-CV-376)

Before JOLLY, DENNIS, and PRADO, Circuit Judges.

PER CURIAM:[*]

Kevin Scott Varga was convicted of capital murder and sentenced to death for killing David Logie in the course of committing robbery or for killing David Logie and David L. McCoy in the same criminal transaction. He was denied habeas relief in state habeas court and in federal district court and now seeks a Certificate of Appealability ("COA") authorizing him to appeal the district court's denial of relief for four claims:

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

(1) that he was denied his right to trial by an impartial jury and due process by the exclusion of a qualified venire member for cause on the basis of her conscientious scruples against the death penalty;

(2) that his counsel was ineffective in not raising this exclusion on appeal;

(3) that he was denied due process by the introduction of impermissible irrelevant victim impact or rebuttal evidence at the punishment phase; and

(4) that he was denied his right to trial by an impartial jury because the jury was not required to find beyond a reasonable doubt that there were no mitigating circumstances sufficient to warrant a sentence of life imprisonment instead of death.

Because we conclude that Varga has not made a substantial showing of a denial of a constitutional right, we deny the COA as to all four claims.

## I. BACKGROUND

Petitioner Kevin Scott Varga was convicted of capital murder and sentenced to death for killing two men as part of an extortion scheme. Most of the evidence leading to his conviction came from the testimony of his seventeen-year-old co-defendant, Venus Anderson, who was granted limited immunity from prosecution in exchange for her testimony. According to Anderson, she and Varga, along with another man and woman, Billy Galloway and Deanee Ann Bayless, decided to drive together from South Dakota to Mexico. Varga suggested that they "roll" men along the way to make money: his plan was that Anderson would pick up a man at a bar and bring him back to a hotel, where Varga would be hiding. Varga would then come out of hiding and blackmail the men for money. Anderson agreed to this plan.

In Wichita, Kansas, Anderson, Bayless, and Galloway picked up David McCoy at a bar and brought him back to the hotel room. Varga, who had been hiding in the bathroom, entered the room with a metal pole. Anderson left the

room but testified to hearing thuds and hearing Galloway yell "that's enough." When Anderson returned McCoy was lying on the floor. The foursome wrapped McCoy's body in blankets and loaded it into their car, which they abandoned a few blocks away after it broke down. The body was found a few days later. At Varga's trial the medical examiner testified that McCoy suffered severe skull fractures; the cause of death was determined to be blunt force trauma to the head.

After abandoning the car the foursome continued south in McCoy's car. In Greenville, Texas, Anderson and Bayless picked up David Logie at a Holiday Inn. Anderson and Bayless left with Logie in his car, with Bayless at the wheel, and Galloway and Varga followed them. Bayless drove to a deserted area of town, and Bayless and Logie got out of the car. Anderson testified that a few minutes later she heard Galloway's voice and saw him punching Logie. After several minutes Varga appeared from behind the car and handed Galloway an object, which Galloway used to strike Logie. A police officer testified at trial that a ball-peen hammer and pieces of a bloody tree limb were found near the body. The foursome took Logie's wallet and dragged his body into the woods, and set fire to McCoy's car. The medical examiner testified that Logie suffered extensive injuries to the head region, including multiple fractures and lacerations, that were consistent with having been struck with a hammer and/or a tree limb. The cause of death was determined to be blunt force injuries to the head.

The foursome continued south in Logie's car to San Antonio, Texas, where Anderson and Bayless went shopping using Logie's credit cards; Varga and Galloway went to a strip club. When Anderson and Bayless left the mall they were pulled over by the police, whereupon Anderson confessed to the murders and surrounding events. The police subsequently arrested Galloway and Varga.

Varga was convicted of capital murder in November 2000 under Tex. Penal Code Ann. § 19.03(a). During the punishment phase the prosecution presented

3

evidence that Varga and two other inmates had attempted an escape while incarcerated at the Hunt County Sheriff's Department because, according to Varga, "I had to try. I have nothing to lose." The prosecution also presented evidence that Varga's ex-wife had made several 911 calls in which she accused Varga of domestic abuse, and that an officer responding to one of the calls saw Varga strike someone twice in the head. Another police officer testified that, upon examining the house where Varga lived before leaving town and committing the murders, the officer found the words "death is coming" written in mustard on the bottom of the sink, as well as Varga's ex-wife's driver's license with the photo scratched out and a copy of a protective order on which someone had scrawled "fuck you." Finally, the prosecution presented evidence that while previously incarcerated at a South Dakota prison Varga was classified as among the most aggressive prisoners and a prison official testified that he preyed on weaker inmates and was a constant threat.

Varga's conviction and sentence were affirmed on direct appeal by the Texas Court of Criminal Appeals. *Varga v. State*, No. 73, 990 (Tex. Crim. App. 2003). Varga did not petition the Supreme Court for certiorari review. While his direct appeal was pending, Varga filed a state habeas petition, which was denied. *Ex parte Varga*, No. 59, 471-01 (Tex. Crim. App. 2004). Varga then filed a habeas petition in federal district court, which was denied. The district court also denied a COA. Varga now appeals the denial of the COA.

## II. STANDARD OF REVIEW

Federal habeas petitioners are not entitled to an appeal from a federal district court's denial of habeas relief as of right. *See* 28. U.S.C. § 2253(c)(1). To quality for a COA, a petitioner must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A COA is appropriate when "reasonable jurists could debate whether (or for that matter, agree that) the

petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks omitted). The question in considering whether to grant a COA is the "debatability of the underlying constitutional claim, not the resolution of that debate." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Where a district court has denied claims on procedural grounds, a COA is warranted only when "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* . . . jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484 (emphasis added).

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), petitioners appealing a state court capital punishment sentence in federal court must show that the state court's adjudication was either "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). An adjudication is contrary to established federal law when it "applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). State court factual findings are entitled to a presumption of correctness under the statute. 28 U.S.C. § 2254(e)(1).

### III. ANALYSIS

Claim One:

Varga's first claim is that he was denied an impartial jury and due process in violation of the Sixth and Fourteenth Amendments because a qualified venire member named Harvetta Machell Robertson was excluded from jury service on account of what every court to consider the question has deemed the basis of her vacillating answers and bias against the death penalty, but what Varga argues were actually permissible conscientious scruples. During extended questioning by both the prosecution and the defense, Robertson indicated that she had strong religious objections to the death penalty – in explaining her views she said "the end result is the same whether it's someone taking a gun or a knife or if it's someone who has been injected with – you know, because of a crime that they've been committed [sic], the end result is a life that's been taken," and when asked "You have a moral belief that man should never take another man's life; that's reserved for God, right?" she said "Yes." She indicated at several points that she would "have a very difficult time" voting for the death penalty.

Robertson testified multiple times that she believed she could follow the law as she was charged, and she testified that she would not make up mitigating circumstances or automatically return a life sentence even if the government proved its case. But she also testified that she believed her opposition to the death penalty "maybe would influence even to this point the way that I hear some things that are presented even before you get to the sentencing stage," and that she did not know "how to set aside [her] personal beliefs." At one point, during a discussion about whether she thought a death sentence "should" happen, she was asked "In this circumstance . . . do you think that you could ever, ever give the death penalty?" and she answered "No." The record does not clearly reflect what "circumstances" Robertson and counsel understood themselves to be discussing. At the end of counsels' questioning, the district court judge asked Robertson: "Can you set aside your strong feelings against the

death penalty and answer the questions according to the evidence?" Robertson replied: "I can't say that I would be able to . . . put . . . my feelings about it aside."

Varga raised this claim for the first time in his state habeas appeal. The state district court found that Robertson was "unclear about her ability to follow the law and not her personal religious beliefs," and that her "bias against the death penalty would substantially impair her ability to carry out the oath and instructions in accordance with the law, and . . . that there was sufficient bias to strike [her] for cause." The Texas Court of Criminal Appeals adopted the findings and conclusions of the district court judge and denied habeas relief. The federal district court found that the state court's conclusions were not unreasonable applications of the law because Robertson, while stating that she could follow the law, also stated she could not give the death penalty and did not know how to put aside her beliefs. According to the district court, "the record before this Court supports the state habeas court's conclusion that Ms. Robertson's views against capital punishment would either prevent or substantially impair her ability to perform her duties as a juror with respect to the instructions and her oath." Thus, the district court held, Varga's constitutional rights were not violated by her exclusion for cause. We agree.

The Sixth Amendment right to a fair trial guarantees an impartial jury. *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 551 (1976). In *Witherspoon v. Illinois*, 391 U.S. 510 (1968), the Supreme Court held that the Sixth Amendment is violated where veniremen are excluded "simply because they voice[] general objections to the death penalty or express[] conscientious or religious scruples against its infliction" if such veniremen can still follow the law, *id.* at 522. A prospective juror thus cannot be challenged for cause because of his opposition to capital punishment unless said opposition "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams v. Texas*, 448 U.S. 38, 45 (1980); *Wainwright*

*v. Witt*, 469 U.S. 412, 424 (1985). Excusal of a juror for cause in violation of *Witherspoon* is reversible error and not subject to harmless error review. *Gray v. Mississippi*, 481 U.S. 648, 668 (1987).

The Supreme Court has specifically indicated that an expressed willingness to follow the law does not necessarily overcome other indications of bias. *Morgan v. Illinois*, 504 U.S. 719, 735 (1992). *Morgan* considered the question of whether a death-eligible defendant has a constitutional right to question prospective jury members as to whether they would *always* vote to return a punishment of death if authorized to do so. In explaining that general questions as to bias were insufficient to ferret out this type of bias (the opposite of the type in this case), the Court noted that "a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining . . . dogmatic beliefs about the death penalty would prevent him or her from doing so." *Id*. As an example, the Court quoted an exchange between the trial judge and a prospective juror in *Witt*:

> "THE COURT: Will you follow the law that I give you?
>
> "[A]: I could do that.
>
> "THE COURT: What I am concerned about is that you indicated that you have a state of mind that might make you be unable to follow the law of this State.
>
> "[A]: I could not bring back a death penalty.

*Morgan*, 504 U.S. at 735 n.9 (alterations in original). This exchange, according to the Supreme Court, is one that illustrates the fact that a prospective juror may believe she can follow the law and yet will actually be so biased in one direction or another that her inclusion would infect a trial with fundamental unfairness. *Id*. at 735. The corollary, of course, is that such a venire member would be properly excluded for cause because her beliefs would prevent or

substantially impair the performance of her duties as a juror. *See, e.g.*, *Beuke v. Houk*, 537 F.3d 618, 638 (6th Cir. 2008) (holding on habeas review that state court exclusion of vacillating jurors for cause based on bias against capital punishment was a reasonable application of *Morgan* and *Witt*).

The exclusion of a juror for bias under the *Witherspoon-Witt* standard is a question of fact subject to deferential review under AEDPA. *Ortiz v. Quarterman*, 504 F.3d 492, 501 (5th Cir. 2007); *see also Beuke*, 537 F.3d at 638-39. The state court's resolution of this claim is thus presumed correct, and a habeas petitioner must rebut this presumption by clear and convincing evidence. *Ortiz*, 504 F.3d at 501.

Varga has not met this standard. Robertson's responses in voir dire are not as clearly inconsistent and contradictory as the exchange from *Witt* excerpted above. Robertson testified that she believed she could follow the law, that she would listen to the evidence, and that she would not automatically return a life sentence instead of a death sentence. But she also testified repeatedly that she would find serving on a capital jury extremely difficult, that she did not know how to set aside her beliefs, that she believed her beliefs would affect her perception of the government's case, and at one point, when asked point blank, said she could not return a verdict of death in "these circumstances." Although the transcript does not clearly reflect what "these circumstances" meant in context, this minor ambiguity is not enough to make a dispositive difference. In essence Robertson gave, in longer form, the same answers given by the juror in *Witt*. Deference is paid to a trial judge's determination of bias precisely because the trial judge is there to see and hear the juror and is in the best position to make credibility determinations. *Patton v. Yount*, 467 U.S. 1025, 1038 (1984). Given Robertson's contradictory testimony, reasonable jurists could not disagree that Varga has failed to rebut the presumption of correctness accorded this ruling by clear and convincing evidence.

Claim Two:

The second claim raised by Varga as the basis for a COA is an ineffective assistance of counsel claim against the counsel who represented him in the state court proceedings, based on the failure to appeal the exclusion of Robertson from the jury. The state habeas court found that Varga had not proven ineffective assistance of counsel because the trial court had not erred in excusing Robertson for cause based on her vacillation and her acknowledgment that her views on the death penalty would affect her performance as a juror. The Texas Court of Criminal Appeals adopted these conclusions and denied relief on this claim. The district court held that counsel was not ineffective for failing to raise this issue on appeal because, in a recent Texas Court of Criminal Appeals decision, that court held that a prospective juror who gave conflicting answers as to her opposition to the death penalty and ability to follow the law could be struck for cause. *Russeau v. State*, 171 S.W.3d 871, 879-80 (Tex. Crim. App. 2005). The district court reasoned that given *Russeau*, Varga had not established that any claim his counsel had raised on direct appeal would have been decided differently or made any difference to the outcome of his appeal. We agree.

The Supreme Court has articulated a now-familiar test for claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). The Sixth Amendment does not require appellate counsel to raise every non-frivolous claim available on appeal, since counsel's effort to serve his client to the best of his professional ability will often depend on strategic choices about which claims to pursue on appeal. *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983). However, the Supreme Court has indicated that, while difficult, it is possible to make out a claim for ineffective assistance of counsel based on defense counsel's failure to raise certain issues on appeal. *Smith v. Robbins,* 528 U.S. 259, 288 (2000) ("Notwithstanding *Barnes*, it is still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent."). In *Smith*, the Supreme Court identified, as an example supporting this statement, the Seventh Circuit case of *Gray v. Greer*, 800 F.2d 644 (7th Cir. 1986), in which that court stated that "[g]enerally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Smith*, 528 U.S. at 288 (quoting *Gray*, 800 F.2d at 646). In *Gray*, the Seventh Circuit further held that if appellate counsel "failed to raise a significant and obvious issue, the failure could be viewed as deficient performance" and that if the issue that was not raised "may have resulted in a reversal of the conviction, or an order for a new trial, the failure was prejudicial." 800 F.2d at 646.

We have found that reasonable jurists could not disagree that the state court's exclusion of Robertson was a reasonable application of the law. Thus the state court was reasonable in finding that it was not ineffective assistance of counsel not to bring a likely meritless claim on appeal. Further, as the district court reasoned, Varga has not made any showing that the Texas Court of Criminal Appeals would have decided his case any differently than it decided a similar situation in *Russeau*, and thus has not made any showing that the outcome of his appeal would have been any different had counsel raised

Robertson's exclusion on direct appeal. Reasonable jurists could not disagree that the state court's determination that counsel was not ineffective was a reasonable application of federal law.


Claim Three:

Varga contends that his due process rights were violated because, during rebuttal at the punishment phase, the state trial court allowed the prosecution, over the defense's objection, to elicit evidence from Logie's widow about abuse she suffered as a child at the hands of her step-father.  Diane Logie, the widow of one of the men Varga was convicted of murdering, was permitted to describe for the jury physical and verbal abuse she endured at her step-father's hands between the ages of six and thirteen. Although Varga had testified as to his own childhood circumstances the defense did not argue that his childhood explained or excused his crime – the evidence was standard mitigation evidence offered to give the jury an understanding of Varga's character and history in order to enable them to make the individualized determination that the Constitution requires. *See, e.g.*, *Tuilapea v. California*, 512 U.S. 967, 972 (1994). The prosecution, however, argued that implicit in Varga's testimony was an argument that people who suffer in childhood later commit crimes, and that Mrs. Logie's testimony was rebuttal to that argument since she suffered abuse in childhood but did not commit any crimes. The evidence was admitted on this basis. Varga argues on appeal that the evidence was irrelevant and that it was injurious because it intensified the jury's sympathy for Mrs. Logie and invited the jury to judge Varga based on Mrs. Logie's moral character.

The admission of unduly prejudicial evidence is a violation of the Due Process Clause of the Fourteenth Amendment if it renders the trial fundamentally unfair. *Payne v. Tennessee*, 501 U.S. 808, 825 (1991); *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986). This circuit has held that "the

erroneous admission of prejudicial evidence will justify habeas relief only if the admission was a crucial, highly significant factor in the defendant's conviction." *Wood v. Quarterman*, 503 F.3d 408, 414 (2007). The Texas Court of Criminal Appeals, on direct and habeas review, and the district court below, in considering whether this testimony compromised the fairness of Varga's trial, assumed that it was irrelevant and improper rebuttal testimony but concluded that since it was advancing a well-known proposition (that people with bad childhoods do not always commit crimes), and was short and not inflammatory, it could not have seriously damaged his chances of obtaining life imprisonment instead of a death sentence. Any alleged error in its admission was thus deemed harmless.

Reasonable jurists could not disagree that the state court's determination that this error was harmless was a reasonable application of federal law. Mrs. Logie's evidence occupied only two pages of the trial transcript. The murders themselves were gruesome and the jury heard substantial evidence to this effect during the guilt phase of the trial. In addition, at the punishment phase, the State presented evidence that petitioner had attempted to escape from jail while awaiting trial; that police had been called to his house numerous times on domestic violence complaints, and that police had seen him strike someone during one of these calls; that police had found his ex-wife's driver's license with the face scratched out and a copy of a restraining order with "fuck you" written on it at his house; and that while previously incarcerated the defendant had preyed on other inmates and been a constant security risk. In the context of all this evidence the admission of Mrs. Logie's short testimony, while it may have been erroneous, cannot be said to have had such a substantial and injurious effect on the trial that it rendered it constitutionally unfair. *See, e.g., O'Brien v. Dretke*, 156 Fed. App'x 724, 737-38 (5th Cir. 2005) (unpublished) (denying COA on ground that any error in admission of testimony about defendant's gang

affiliation at penalty phase was harmless where substantial evidence was presented about defendant's brutal rape and murder of a teenage girl and his past criminal history and violent behavior). The COA is denied as to this claim.

Claim Four:

Varga's final claim is that his sentence violates the Sixth Amendment, as applied in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona,* 536 U.S. 548 (2002), because his death sentence did not require a jury to find beyond a reasonable doubt that there was an absence of mitigating circumstances warranting life imprisonment instead of death. The state habeas court held that the claim was procedurally barred because it had not been raised at trial, and alternatively that it was foreclosed by Fifth Circuit precedent. The district court held that the claim was procedurally barred in federal court because the state habeas court had denied relief on the basis of an independent and adequate state law ground, and that alternatively it was barred by Fifth Circuit precedent.

It is well established that a habeas petitioner's federal claim is defaulted when the last state court to consider it denied relief based on an adequate and independent state law ground. *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991). We have held that the Texas contemporaneous objection rule constitutes an adequate and independent state ground. *Jackson v. Johnson*, 194 F.3d 641, 652 (5th Cir. 1999).

Varga argues that the claim is not barred because his objection was not available at trial because, although *Apprendi* had already been handed down at the time, *Ring* had not. Even assuming *arguendo* that the claim is not procedurally barred, the substance of the claim is foreclosed by circuit precedent. This circuit has specifically held that the Texas death penalty scheme does not violate the Sixth Amendment even though it does not require the prosecution to prove the absence of mitigating factors beyond a reasonable doubt. *Granados v.*

*Quarterman*, 455 F.3d 529, 536-37 (5th Cir. 2006). Where a district court has denied claims on procedural grounds, a COA is warranted only when "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and . . .* jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484 (emphasis added).

Varga acknowledges that *Granados* and the cases following it foreclose his claim, but argues they were incorrectly decided and thus that reasonable jurists could disagree with the district court's denial of relief on this basis. However a panel of this circuit is not at liberty to overrule a prior decision of another panel of this circuit in the absence of *en banc* consideration or intervening Supreme Court precedent. *United States v. Lipscomb*, 299 F.3d 303, 313 (5th Cir. 2002). Thus reasonable jurists could not disagree that the petition does not state a claim for relief on this ground, and the COA is denied as to Claim Four.

## IV. CONCLUSION

For the foregoing reasons, Varga's request for a COA is DENIED as to all claims.