# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

―――――――――

m 00-31359

―――――――――

DOUGLAS A. DILOSA,

Petitioner-Appellee,

VERSUS

BURL CAIN,
WARDEN, LOUISIANA STATE PENITENTIARY,

Respondent-Appellant.

―――――――――――――――

Appeal from the United States District Court
for the Eastern District of Louisiana

―――――――――――――――

January 9, 2002

Before JONES, SMITH, and DEMOSS,
    Circuit Judges.

JERRY E. SMITH, Circuit Judge:

The State of Louisiana, through its warden, appeals a judgment granting habeas corpus relief to Douglas DiLosa regarding his murder conviction. Finding no error, we affirm.

I.

One day in 1986, police received a 911 call from the DiLosa household and discovered DiLosa tied up on the living room floor; his wife was found, strangled, on a bed bound with the same rope used to bind DiLosa. The condominium had been ransacked with the exception of the son's room. DiLosa told the police he awakened around 3:30 a.m. to noises downstairs. When he investigated, he discovered two black male intruders. DiLosa claims they beat him unconscious, and the next he knew he roused from this beating bound and on the floor with the house in shambles. He called out to his son, whom he instructed to call 911. Only after reaching the hospital was DiLosa told of his wife's death.

## II.

In time, DiLosa was arrested based on evidence contradicting his version of the events. Investigators also had discovered possible motive evidenceSSDiLosa was out of work, his unemployment benefits were about to run out, a large payment was near due on the condo, and his wife's life was insured for a substantial sum.

The prosecution's argument at trial focused on the absence of evidence of any other perpetrator. The prosecution emphasized the lack of any physical evidence of a black intruder in the DiLosa household, noting, in closing argument, "There was not one, not one shred of black hair found in that residence."

The state also drew attention to the want of any evidence of intruders in the surrounding neighborhood. Again, this point was stressed during closing argument: "Did you hear any evidence about any other houses that were hit that night?"

Although some of the evidence was disputed at trial, DiLosa was convicted of murder. An intermediate appellate court affirmed his conviction, and the Louisiana Supreme Court refused his petition for writ for certiorari.

DiLosa filed a first application for post-conviction relief, which was denied. In his second application, he argued that the state had violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to turn over material evidence. When this claim reached the Louisiana Supreme Court, it ordered a hearing to determine whether DiLosa'a *Brady* claim was based on facts not disclosed.

The evidence in question related to the presence of hair of unknown type on the rope around DiLosa's wife's neck and on the bed where her body was discovered. Additional evidence related to the presence of fingerprints in the condo that could not be positively identified. There was also evidence of another attempted break-in at a nearby condo.

On remand, the trial court determined there had been no *Brady* violation, because the undisclosed evidence did not "create a reasonable possibility of a different result." This determination was affirmed by an appellate court and the Louisiana Supreme Court. DiLosa next filed a *pro se* 28 U.S.C. § 2254 petition, raising claims in addition to the alleged *Brady* violation. A magistrate judge ("MJ") recommended relief on the *Brady* claim and on additional errors raised by DiLosa that are not relevant to this appeal. The district court sustained an objection to these additional claims but granted DiLosa's petition on the *Brady* violation. The state appeals.[1]

## III.

Our consideration of DiLosa's appeal is constrained by the highly deferential framework of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), under which the burden is on the habeas petitioner to demonstrate that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).[2]

---

[1] No certificate of appealability is required, because the state is the appellant. FED. R. APP. P. 22(b)(3).

[2] Because a *Brady* claim involves a mixed question of law and fact, § 2254(d)(1) applies instead
(continued...)

AEDPA affords two avenues of relief for a habeas petitioner in federal court: He must show that the state court construction was either "contrary to" federal law or an "unreasonable application" of it. To be "contrary to" federal law, the state court must apply a rule that contradicts a rule laid down by the Supreme Court. *Williams v. Taylor*, 529 U.S. 363, 405 (2000).

A second avenue of relief is available where the state court unreasonably applies federal law. This inquiry involves asking "whether the state court's interpretation of clearly established federal law was objectively unreasonable." *Id.* Some of our recent cases have fleshed out the meaning of "objectively unreasonable."

To be unreasonable, the state court application of federal law must be something more than merely erroneous. *Martin v. Cain*, 246 F.3d 471, 476 (5th Cir.), *cert. denied*, 515 U.S. 1105 (2001). Our role under this inquiry is not to determine whether the state court's construction of federal law was merely wrong, but whether it was wrong to the point of being unreasonable.

We also have focused the subject of this inquiry on the state court's ultimate conclusion, not on its reasoning process. *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001). We thus are faced with the questions of whether the Louisiana state court misapplied a federal standard and whether the state court's decision that DiLosa did not state a viable *Brady* claim is an unreasonable legal conclusion.

---

[2](...continued)
of § 2254(d)(2). *Trevino v. Johnson*, 168 F.3d 173, 184 (5th Cir. 1999).

## IV.
### A.

DiLosa's habeas petition was granted based on the due process protections afforded a defendant under *Brady*'s interpretation of the Fifth Amendment. *Brady* requires the state to "disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." *United States v. Bagley*. 473 U.S. 667, 675 (1985).

Under *Brady*, to establish that the state has breached this duty, the defendant must show that (1) the state withheld evidence, (2) the evidence is favorable to the accused, and (3) the evidence is material to guilt or punishment. *Bagley*, 473 U.S. at 674. This duty extends to both exculpatory and impeachment evidence. *Id.* at 676. Our inquiry here is narrow. Both parties agreeSSonly the third prong is at issue.

The Supreme Court has imposed four criteria for determining whether evidence is material. First, materiality does not require the defendant to demonstrate by a preponderance of the evidence that omitted evidence would have resulted in acquittal. Second, he need not weigh the withheld evidence against the disclosed evidence to show he would have been acquitted by the resulting totality. Third, if evidence is found material, there is no need to conduct a harmless error analysis. Fourth, the withheld evidence should be considered as a whole, not item-by-item. *Kyles v. Whitley*, 514 U.S. 419, 434-37 (1995). The sum of these four guideposts means that to show a due process violation when the state withholds evidence, a defendant need not prove that his trial necessarily would have had a different outcome; a lack of faith in the result is sufficient.

### B.

The withheld evidence was contained in a supplemental police report and grand jury testimony. There were four main categories of withheld evidence. The first consisted of references to the presence of possibly non-caucasian hair samples.

One of the detectives observed what he described as "Negroid type hair" on the bed next to the victim's body. Warren, a forensic biologist, had advised one of the investigators that "a hair of unknown origin, definitely not Caucasian head or pubic hair was found on the rope around the victim's neck." Warren also had tested two hair strands from tape on the window where a pane of glass had been removed. One of these was "animalistic or Negroid hair" that "had more animalistic characteristics."

A second category of withheld evidence concerned fingerprint testing. The withheld report refers to prints, found on the inside of a drawer, that could not be identified. The report also mentions partial fingerprints discovered on a pane of glass.

A third body of evidence related to the testimony of those present in a neighboring condo the night of the murder. One of these neighbors, Mrs. Warbritton, testified to hearing a noise on her patio in the middle of the night. She also testified that she saw a shadow of a large dog or person that moved from her sliding glass door to the patio gate and then to the street. There was further testimony, from her son and a friend who were staying with her, that they found the patio gate open, despite being certain it was closed when they went to bed. One of the investigating officers later discovered pry marks on the door to the Warbritton condo. Warbritton and her son testified to the absence of these marks the day before the murder.

A final piece of withheld evidence concerned statements by a taxi driver who was in the neighborhood in the early morning after the murder. He stated he had seen two black men exit the condo complex at 5:45 a.m. He also noted the driver, who looked "tense," facing straight ahead, gripping the steering wheel and driving very slowly.

### V.

The state court exceeded the bounds of permissible application of federal law in two distinct ways. First, it applied an incorrect legal principle in concluding there was no material evidence for *Brady* purposes. Second, its ultimate legal conclusion cannot be squared with the command of *Brady* and its progeny. The state court's legal conclusion was objectively unreasonable.

### A.

One way a state court contravenes its duty to follow federal law is to fail to apply the proper legal standard as announced by the Supreme Court. 28 U.S.C. § 2254(d)(1). As the Court has elaborated by example:

A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. Take, for example, our decision in *Strickland v. Washington*. If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would

4

be "diametrically different," "opposite in character or nature," and "mutually opposed" to our clearly established precedent because we held in *Strickland* that the prisoner need only demonstrate a "reasonable probability that . . . the result of the proceeding would have been different."

*Williams*, 529 U.S. at 405-06 (internal citations omitted).

The state court applied a rule of law contrary to that established by the Supreme Court. Specifically, the court considered the sufficiency of the evidence in light of its potential to exculpate DiLosa instead of through the lens of its confidence in the verdict.

B.

The state court's misstep was its use of an analysis contrary to *Kyles*, i.e., incorrectly assuming that sufficiency of evidence is relevant for *Brady* analysis. When discussing the hair samples, the state court dismissed the potential *Brady* materiality of statements concerning possible non-caucasian hair samples, because the forensic biologist had presented the only "reliable evidence."

Implicit in this language is the state court's evaluation of the existing inculpatory evidence in light of the excluded, and potentially exculpatory, evidence. It is not the role of a court applying *Brady* to weigh the existing evidence against the excluded evidence, but rather to ask whether the excluded evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

C.

Even aside from the state court's use of a legal rule contrary to *Kyles*, its ultimate legal conclusion cannot be reconciled with *Brady* and *Kyles*. The most obvious example is the state court's handling of two of the pieces of alleged exculpatory evidence.

Two statements DiLosa claims support his theory of the case were those made by Warbritton and her guests and those made by the taxi driver. The statements of Warbritton and her guests lend credibility to DiLosa's story about a robbery by two black men. The statements by the taxi driver are not necessarily inconsistent with those of the Warbritton household or with DiLosa's story.

The state court, however, dismissed the *Brady* relevance of these statements by finding them contradictory. We need not delve into any possible inconsistency, which is up to the jury to decide, because, as the MJ found, the statements, in any event, were potentially exculpatory and should have been disclosed.

The trial court's conclusion is unsettling for additional reasons. The hair and fingerprint evidence, like the evidence of happenings in the neighborhood, could have been used to create reasonable doubt in a state case premised almost entirely on circumstance.

The state's case was built mostly on the inferences of motive from the DiLosas' poor financial situation and the value of Mrs. DiLosa's life insurance. The physical evidence was based on inferences drawn from the lack of physical evidence of potential intruders. The witness evidence was premised on what the neighbors did not see or hear.

Indeed, the prosecution presented the case as a choice between two theories: Either Di-

Losa murdered his wife for the life insurance and covered it up, or there really were two black intruders. The prosecution then refuted the latter theory by pointing to the lack of physical evidence of anyone in the house except DiLosa and the lack of evidence of intruders in the neighborhood. The state thus based its case on the non-existence of evidence it knew existed.

In light of this, the excluded evidence potentially pointing to intruders in the house, and the statements of three witnesses pointing to potential intruders in the neighborhood, leave us with a definite conviction that the inclusion of the evidence withheld from DiLosa reasonably could undermine the confidence of any reasonable jurist in the conviction. The state court's legal conclusion to the contrary is not simply a misconstruction of *Brady*, but one serious enough to be unreasonable. We AFFIRM the judgment and order DiLosa released if the state does not retry him within 120 days.