United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 5, 2006**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 05-70009

CARLOS GRANADOS,

Petitioner-Appellant,

versus

NATHANIEL QUARTERMAN, Director,
Texas Department of Criminal Justice,
Correctional Institutions Division,

Respondent-Appellee.

Appeal from the United States District Court
For the Western District of Texas

Before JOLLY, HIGGINBOTHAM, and WIENER, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge.

Sentenced to death in Williamson County, Texas, Carlos Granados appeals from a final judgment of the United States District Court, Western District of Texas, denying his petition for writ of habeas corpus claiming constitutional error in his conviction and death sentence.

I

The Texas Court of Criminal Appeals affirmed the conviction on direct appeal[1] and the Supreme Court denied certiorari.[2] Granados's ensuing petition for state habeas relief was denied by the Texas

---

[1]*Granados v. State*, 85 S.W.3d 217 (Tex. Crim. App. 2002).

[2]*Granados v. Texas*, 538 U.S. 927 (2003).

Court of Criminal Appeals in a per curiam order adopting the findings of the state trial Judge.[3] The present federal proceeding followed. On recommendation of a federal magistrate judge, the district court dismissed Granados's petition and denied a certificate of appealability. We granted a COA on two issues, received full briefing, and heard oral argument. The two issues are:

1. Whether Granados was denied his Sixth Amendment right to constitutionally effective counsel during the punishment phase of trial because counsel allowed her own expert witness, Dr. Walter Quijano, to testify concerning race or ethnicity; and

2. Whether Granados's Sixth Amendment rights under *Ring v. Arizona*, 536 U.S. 584 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), were violated because the State was not required to prove beyond a reasonable doubt a negative answer to the mitigation special issue.

We now affirm the denial of federal habeas relief.

II

The Texas Court of Criminal Appeals set out the facts of the crime:

Katherine Jiminez testified at trial and described appellant's actions in detail. She indicated that she first met appellant in 1993. The two became friends, spent time together socially, and dated for a short time. They parted ways soon thereafter, but remained in friendly contact. Katherine then married Anthony Jiminez in April of 1994, and on June 13, 1995, she gave birth to a son, Anthony. Katherine and her husband eventually separated, and in late 1997, she re-established a relationship with appellant, who then lived in New York. In January of 1998, Katherine moved into an apartment of

---

[3]*Ex parte Granados*, No. 51,135-01 (Tex. Crim. App. 2002) (unpublished).

2

her own in Georgetown.  In March, appellant visited her from New York.  After another visit in July of 1998, appellant decided to return to Texas.  Katherine and appellant agreed that they would live together until appellant got on his feet.  In late August, he began living with Katherine and three-year-old Anthony in Katherine's apartment.

Less than a month later, on Sunday, September 13, 1998, Katherine, appellant, and Anthony returned to Katherine's apartment after having lunch at appellant's brother's house.  Katherine and appellant were both supposed to go to work that evening.  Katherine planned to drop Anthony off at her mother's house, where he would remain until Katherine could pick him up the next morning.  Appellant wanted Katherine to join him in a nap that afternoon, but she refused, because she needed to finish chores around the apartment and because she did not want to take a nap while Anthony was awake.  Meanwhile, Anthony was in the living room watching television.  Appellant, angry that Katherine would not take a nap with him, knocked a plate of food from her hand.  The two then retreated to the bedroom where they began arguing.  At that point, Katherine told appellant, "I don't even want to talk to you anymore.  I don't want to look at you.  I don't want you to be around me....  I don't want you here.  Just get your things and leave." Appellant said, "You want me to leave?" and Katherine said, "Yeah, I want you to leave."

A brief cooling off period ensued, and the two began talking again.  During this time, Katherine's sister Elizabeth called, but appellant said Katherine was busy and hung up the telephone.  Katherine told appellant to "get his stuff and leave."  Katherine then repeated that she wanted him to leave.  Appellant left the room, and when he came back asked again, "You want me to leave?" and she said that she did.  Angered, appellant said, "Fuck it.  Fuck it," and attacked Katherine with a knife. He stabbed her repeatedly and slashed her throat.  Then, apparently, the knife broke.  Katherine struggled and attempted to placate appellant by telling him that she loved him.  Eventually, appellant began crying, afraid that he would go to jail.  Katherine said that she would contrive a false story about her injuries if appellant would simply leave.

Katherine tried unsuccessfully to telephone the police and to escape, but appellant caught her and

3

dragged her to the kitchen. He stabbed her again repeatedly, and she feigned death. Appellant left the kitchen, and Katherine heard Anthony scream, I don't want to die. Don't kill me. I don't want to die." Stabbed in the chest, Anthony died within moments.

Later, Katherine heard her sister and her nephew outside the apartment. Afraid appellant would finally kill her if she screamed for help, however, she remained silent. Appellant stayed active throughout the night. He came to the kitchen where Katherine lay and showed her that he had slashed his wrists, stating, "Look, I'm going to die with you." Later, he telephoned his father. Several hours later, believing that her death was imminent, Katherine dragged her body toward her son, wanting to die by his side.

Meanwhile, Katherine's family became worried that they had not heard from her, that she had not arrived for work, and that she had not left Anthony with her mother at the regularly scheduled time. Elizabeth Ojeda, one of Katherine's sisters, testified that, after she called Katherine's apartment, left messages on her answering machine, visited the apartment, and received no response to her knock, Ojeda telephoned the apartment manager and Georgetown Police. Early Monday morning, two officers visited the apartment on a welfare concern call. Corporal Gregory Brunson testified that he noticed both Katherine's and appellant's vehicles in the parking lot of the apartment complex. He also confirmed information about who was paying utilities at Apartment 3206, Katherine's apartment. Corporal Brunson and Officer Vasquez approached the apartment door and knocked, but received no response and heard no noise inside the apartment. Corporal Brunson did not see any lights and could not see inside the apartment windows when looking from the north side of the building. Officer Vasquez telephoned the apartment but received no answer. Upon a request from the officers, the apartment manager arrived with a key but was unable to enter the apartment because of an interior deadbolt. At this point, seeing no other means of opening the door, Corporal Brunson telephoned the fire department for assistance. Three firefighters arrived with what Corporal Brunson described as a doorjamb spreader, which is used to open deadbolted doors. After approximately five minutes, the firefighters opened the apartment door.

Upon entering the apartment, one of the firefighters

4

exclaimed that appellant had a knife. Corporal Brunson drew his revolver, approached the door, and saw appellant, whose right hand was initially hidden. In response to Corporal Brunson's orders, appellant raised his right hand, in which he held a large kitchen knife covered in blood. After ordering appellant out of the apartment, Corporal Brunson repeatedly asked appellant to release the knife. Appellant eventually did so and Corporal Brunson handcuffed him. Inside the apartment, Corporal Brunson saw Anthony's body, Katherine's bloody arms protruding from beyond a chair, and blood stains covering the carpet and walls near the kitchen. Once the officers determined that no one else was in the apartment, they allowed medical personnel to enter and begin treating Katherine, who said to Corporal Brunson, "He killed my baby, and I have been waiting for you to come."[4]

III

We turn first to the claim that Granados was denied constitutionally effective defense counsel. He contends that his lawyer injected race into the deliberations of the jury by sponsoring testimony and arguing to the jury in the sentencing phase that Hispanics and African Americans are more likely to be a future danger to society because of their race.

-1-

To establish a Sixth Amendment violation for failed lawyer performance, Granados must meet the two part test of *Strickland v. Washington*.[5] First, Granados must show that counsel's representation fell below the prevailing professional norm, an objective standard of reasonableness drawing upon all the facts and

---

[4]*Granados v. State*, 85 S.W.3d 217, 220-22 (Tex. Crim. App. 2002).

[5]466 U.S. 668 (1984).

5

circumstances of the case. Second, the deficient performance must be shown to have been "so serious as to deprive [Granados] of a fair trial, a trial whose results is reliable."[6] This is a highly deferential standard supported by a strong presumption that the decisions of counsel fall within a wide range of professional assistance. Strickland does not allow second guessing of trial strategy and must be applied with keen awareness that this is an after-the-fact inquiry. It follows that if counsel has investigated the facts and law informing possible tacks ahead, his choice at trial will not be lightly second guessed -- absent a result that robs the client of a fair trial. And, of course, under AEDPA a state court decision rejecting a *Strickland* claim must be accepted unless it was an unreasonable application of its teaching.

-2-

At the sentencing phase, defense counsel called Walter Quijano, Ph.D., a clinical psychologist, as an expert witness on the jury issue of future dangerousness -- whether there was a probability that Granados "would commit criminal acts of violence that would constitute a continuing threat to society."[7]

Dr. Quijano never examined or tested Granados. He expressed his opinion in response to questions of defense counsel, who posed hypotheticals tracking the facts of the case and related personal

---

[6]*Bell v. Cone*, 535 U.S. 685, 695 (2002); *Strickland*, 466 U.S. at 687-88.

[7]Tex. Code Crim. P. § 37.071(b)(1).

circumstances of Granados. Dr. Quijano listed some twenty-two factors predictive of future dangerousness on a chart before the jury. The list included "race or ethnicity."[8] He told the jury that it was one of several statistical facts that "if you just took the characteristics of, quote, violent people would come up over and over again in statistical studies." He also made the following suggestion:

> Race or ethnicity is not politically correct, but we know that minorities are over-represented in the prison system. The prison system is about 40 percent black, about 40 percent Hispanic, and 20 percent white and others, where I belong to the others. And that's just the statistical fact.

He explained that "you first look at the characteristics of the person you are trying to study (determine which can be controlled) and make a judgment about the probability of the person's future dangerousness." He told the jury that race is an example of a characteristic that cannot be controlled, and then told the jury that "for a person of defendant's characteristics in a maximum security prison, the probability is that he will not constitute a continuing danger to the prison society." Granados now attacks counsel's strategy, specifically for eliciting Dr. Quijano's

---

[8]Quijano testified that there are three clusters of factors. The first are statistical factors derived from statistical studies, including age, history of violence, race or ethnicity, use of a weapon, use of drugs or alcohol, socioeconomic status, and work stability. The second cluster involves environmental factors, including family violence, work environment, availability of a weapon, availability of victims, and availability of drugs or alcohol. The third cluster includes the presence or absence of mental illness, special circumstances of the offense, clinical factors (deliberateness of offense), remorse (felt at time of offense), post-conduct charge behavior, and effects of incarceration.

testimony and, he says, for sponsoring race as a sentencing factor in jury argument at the sentencing phase.

The State replies that Dr. Quijano did not "suggest to the jury that race or ethnicity should be a factor in the jury's decision." To the contrary, the State argues, Quijano never retreated from his opinion that Granados would not be dangerous in a prison setting. He explained that additional circumstances supported his opinion, including the fact that Granados had committed an "intrafamily" crime, had a history of "self-destructive male-female relationship problems," had shown remorse, and had not attempted escape. Finally, the state points out that no one argued race or ethnicity during closing arguments and the jury was instructed that "it should not allow bias, prejudice or sympathy play a role in [its] deliberations."

-3-

In recommending that habeas relief be denied, the state trial judge made explicit findings that neither of the two defense counsel nor the state's attorney made any mention of race or ethnicity or "suggested in any manner that a decision on future dangerousness should be based on race or ethnicity." He rejected Granados's *Strickland* claim, persuaded that trial counsel "exercised reasonable judgement in deciding to use Dr. Quijano as an expert witness on the special issues of mitigation and future dangerousness."

8

Turning to the reasonableness of counsel's strategy, we think it plain that counsel considered carefully how best to present the sentencing case, a difficult task considering the violent character of the crime. Counsel first retained a psychiatrist and psychologist, Dr. Cantu and Dr. Parker, to examine Granados and testify as experts regarding the probability of Granados committing violent acts in the future. Then counsel changed course, concluding that their testimony might be more harmful than helpful, a shift that led to the accused strategy. There is nothing to fault this initial decision not to continue with Drs. Cantu and Parker. To the contrary, that counsel must look at every witness he would call as a potential witness for the state is etched in the brain of every experienced trial lawyer and here there was more. By not offering expert testimony based on an examination of Granados, counsel cut off the state's opportunity to have its expert examine Granados and offer testimony. And when defense counsel informed the court that any expert testimony from the defense would not rest on examination by an expert witness, the court denied a pending state motion for examination of Granados by a state expert.

But counsel made a second and larger tactical decision than simply dropping two witnesses. They chose to change their approach at trial to future dangerousness —— inevitably a brooding concern of jurors and most often the point of engagement between the prosecutor and defense. They elected to offer the jury clinical

9

and statistical data on the question of future dangerousness in an effort to have the case viewed in those terms rather than remain focused on Granados and his bloody assaults, accented by the prosecution.  The decision by counsel to approach the question in the relatively oblique and impersonal terms of a quantitative presentation lay at the heart of their trial strategy.  It included facing the reality that blacks and latinos had a disproportionate presence in the state prisons, a social phenomenon about which counsel could not assume the jury was ignorant.  This approach led directly to the hiring of Dr. Quijano, a clinical psychologist with a subspecialty in correctional psychology.  He was prepared to speak about the statistics of recidivism, as well as prison life and conditions.  And, with the use of hypothetical questions, Dr. Quijano was able to relate the data to the life and conduct of Granados.  And as we have noted, this approach avoided the necessity of personal testing and examination, the door opener to examination by experts engaged by the State.  Dr. Quijano fit the bill.  He had worked for federal and state prison systems and testified in about 90 capital murder cases, dividing his work evenly between State and defense.  To the point, Dr. Quijano presented the case in quantitative terms more in the manner of clinical disinterest and less in the manner of subjective

commentary and evaluation of Granados.[9]

Viewed through the AEDPA lens, we cannot conclude that the state court's application of *Strickland* and rejection of the claim of ineffective assistance of counsel was unreasonable. These are difficult and nuanced decisions the trial lawyer must make. That they were not successful does not make them unreasonable. We are not persuaded that these tactical decisions introduced an impermissible use of race or ethnicity or were otherwise objectively unreasonable. We reject the claim of ineffective assistance of counsel.

IV

Granados urges that the Texas mitigation issue is constitutionally flawed in that it does not require the State to prove beyond a reasonable doubt the absence of mitigating circumstances. As we understand the argument, this is because the absence of mitigating evidence is an aggravating circumstance whose presence increases the maximum punishment for capital murder from life to death.

The state replies, first, that this claim was never presented

_____

[9]Context is everything when evaluating *Strickland* claims. The use of Dr. Quianjo's testimony here is very different from the situation in which he testified for the State and expressly linked the defendant's race to the likelihood of future dangerousness, cases in which the State confessed error. *See, e.g.*, *Saldano v. Roach*, 363 F.3d 545, 549 (5th Cir. 2004) (describing how Quijano "opined that there was a correlation between race and ethnicity and future dangerousness," noting that the prosecutor "reminded the jury to consider the twenty-four factors laid out by Quijano," and noting how the Attorney General of Texas confessed error, requiring resentencing); *see also id.* at 549 n.2 (collecting other cases in which Quijano testified for the state and injected race into the proceedings).

11

to the state courts and is procedurally defaulted.  We will not pause to address this contention because we are persuaded that the claim is without merit and must be denied.  Under AEDPA, we can deny unexhausted claims although we could not grant relief.

All the elements of capital murder were put to the jury with instruction that the evidence had to persuade them beyond a reasonable doubt.  No finding by the judge was required to expose Granados to the death penalty.  And the jury was instructed that it could give an affirmative answer to the special issues submitted to the jury in the sentencing phase, including future dangerousness, only if certain of their answer beyond a reasonable doubt.  Finally, there is no contention in this case that Granados's evidence of mitigation could not find expression in the jury's answer to the question of future dangerousness.

In sum, the state was required to prove beyond a reasonable doubt every finding prerequisite to exposing Granados to the maximum penalty of death.  We are not persuaded that Texas violated any principle of *Apprendi* or *Ring* in the trial of this case.  Specifically, it did not do so by not asking the jury to find an absence of mitigating circumstances beyond a reasonable doubt in addition to questions it required the jury to answer.[10]  Put another way, a finding of mitigating circumstances reduces a sentence from death, rather than increasing it to death.

---

[10]*Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Ring v. Arizona*, 536 U.S. 584 (2002).

12

V

Accordingly, we affirm the decision of the district court denying relief and dismissing the petition for habeas corpus.

AFFIRMED.