# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 18, 2009

Charles R. Fulbruge III
Clerk

No. 07-70036

WILLIAM JOSEF BERKLEY

Petitioner-Appellant

v.

NATHANIEL QUARTERMAN, DIRECTOR, TEXAS DEPARTMENT OF
CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

Respondent-Appellee

Appeal from the United States District Court
for the Western District of Texas
USDC No. 3:06-CV-111

Before JOLLY, DENNIS, and PRADO, Circuit Judges.

PER CURIAM:[*]

Petitioner-Appellant William Josef Berkley ("Berkley") was convicted and sentenced to death in 2002 for the murder of Sophia Martinez ("Martinez"). Berkley requests a Certificate of Appealability ("COA") on five issues for which the district court denied him a COA after rejecting Berkley's petition for federal habeas corpus relief. For the reasons detailed below, we decline to grant Berkley a COA on each issue.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A.     Factual Background

On March 10, 2000, a security camera recorded Martinez making a small withdrawal from an ATM at a bank near her home when a male brandishing a handgun approached her vehicle and fired a shot into her car. The male assailant got into Martinez's car and forced a bloody-faced Martinez to withdraw an additional two hundred dollars. Martinez then drove away from the ATM with the male assailant still in her vehicle.

The following day, New Mexico State Police located Martinez's vehicle near El Paso, Texas. When found, the vehicle contained numerous blood stains. The El Paso Police located Martinez's body later that day beside a dirt road in an isolated location. An autopsy revealed that Martinez had been shot five times in the head and that she had engaged in intercourse shortly before her death.

On December 19, 2000, an El Paso grand jury indicted Berkley on a single count of capital murder for Martinez's death. On April 19, 2002, a jury found Berkley guilty of capital murder, and on May 14, 2002, the trial court sentenced him to death. Berkley's conviction and sentence were affirmed on direct appeal, *Berkley v. State*, No. 74,336 (Tex. Crim. App. Apr. 6, 2005), and the United States Supreme Court denied his petition for certiorari, *Berkley v. Texas*, 546 U.S. 1077 (2005). The Texas Court of Criminal Appeals ("TCCA") denied state habeas relief on March 8, 2006. *Ex Parte Berkley*, No. 63,079-01, 2006 WL 561467, at * 1 (Tex. Crim. App. Mar. 8, 2006). The district court denied all of Berkley's claims and his request for a COA to this court on August 24, 2007. *Berkley v. Quarterman*, 507 F. Supp. 2d 692, 753 (W.D. Tex. 2007). Berkley appeals the district court's denial of his request for a COA on five grounds.

## II.  STANDARD OF REVIEW

For this court to have jurisdiction to rule on the merits of the appeal, Berkley must obtain a COA by making "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).  "Under the controlling standard, a petitioner must sho[w] that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 336 (alteration in original and internal quotation marks omitted). "A prisoner seeking a COA must prove something more than the absence of frivolity or the existence of mere good faith on his or her part."  *Id*. at 338 (internal quotation marks and citation omitted).  "The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id*. (internal quotation marks and citation omitted).  "[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Id*.

The Supreme Court has instructed that when a district court dismisses a habeas petition on procedural grounds, "a COA should issue when the prisoner shows, at least, [1] that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and [2] that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  After noting that this is a two-part inquiry, the Court encouraged lower courts to consider the procedural issues first and dispose of any issues that are

procedurally barred before considering the constitutional issues presented by the petition. *Id*. at 485.

> Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further. In such a circumstance, no appeal would be warranted.

*Id*. at 484. Finally, "any doubts as to whether a COA should issue must be resolved in [the petitioner's] favor." *Ramirez v. Dretke*, 398 F.3d 691, 694 (5th Cir. 2005) (alteration in original and internal quotation marks omitted).

## III. DISCUSSION

Berkley requests COA on five issues. First, he asserts that the state trial court violated his rights when it refused to strike a venire member for cause. Second, he challenges the trial court's refusal to instruct the jury that it must agree unanimously on the specific manner in which Berkley committed capital murder. Berkley also asserts, in his third challenge to his conviction, that the trial court erred in failing to instruct the jury on the lesser-included offense of simple murder. Fourth, Berkley argues that the trial court erred by failing to instruct the jury that it must find the absence of mitigating factors beyond a reasonable doubt. Finally, in his fifth challenge to his conviction, Berkley argues that the prosecution violated his rights under *Brady v. Maryland*, 373 U.S. 83 (1963). We consider each in turn.

## A. Bias of Venire Member Lucero

Berkley first argues that he was denied his Sixth and Fourteenth Amendment right to trial before a fair and impartial jury when the state trial court refused to strike venire member Albert Ernest Lucero ("Lucero") for cause. The district court found that Berkley did not "fairly present" this claim to the

4

state court because he did not ask the State to consider this claim on federal grounds. *See Baldwin v. Reese*, 541 U.S. 27, 32 (2004) (holding that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a *federal* claim in order to find material, such as a lower court opinion in the case, that does so" (emphasis added)). Accordingly, the district court found that Berkley procedurally defaulted on this federal constitutional claim. In the alternative, the district court found that the claim lacked merit.

We must first address "whether . . . jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484. If we conclude that the district court was correct, the inquiry ends there. *Id*. In his brief to this court, Berkley has not made any argument regarding the procedural bar and has waived this argument for failure to brief. *See* FED. R. APP. P. 28(a)(9); *United States v. Lindell*, 881 F.2d 1313, 1325 (5th Cir. 1989). In addition, Berkley failed to meet his burden of demonstrating that it is debatable whether the district court's procedural ruling was correct. *See Slack*, 529 U.S. at 484. Berkley's failure to argue the procedural bar issue is dispositive of his underlying constitutional claim. We therefore deny Berkley a COA on this issue.

## B.    Jury Unanimity as to a Particular Theory of Capital Murder

Berkley next argues that the state trial court violated his constitutional right to a unanimous verdict when the court refused to instruct the jury that it must agree unanimously on the specific manner in which Berkley committed capital murder (i.e., whether Martinez was murdered during the course of the

commission of a specific predicate felony, namely robbery, kidnapping, or aggravated sexual assault). The district court found that the Texas court reasonably applied *Schad v. Arizona*, 501 U.S. 624 (1991), when it rejected Berkley's challenge to his jury instructions.

Berkley argues that the Supreme Court, in *Blakely v. Washington* , 542 U.S. 296 (2004), declared that "the truth of every accusation against a defendant should afterwards be confirmed by the unanimous suffrage of twelve of his equals and neighbors," *id.* (internal quotation marks and citation omitted). However, as *Schad* made clear, Berkley's claim is not one of jury unanimity, but rather a challenge to Texas's capital murder statute and the permissibility of defining "capital murder" as a crime involving murder and one of several alternate felonies. *See Schad*, 501 U.S. at 624.

In *Schad*, the Supreme Court considered whether the jury instructions violated the petitioner's right to a unanimous verdict. 501 U.S. at 630. Schad was convicted of first-degree murder under an Arizona statute which defined first-degree murder as:

> A murder which is perpetrated by means of poison or lying in wait, torture or by any other kind of wilful, deliberate or premeditated killing, or which is committed in avoiding or preventing lawful arrest or effecting an escape from legal custody, or in the perpetration of, or attempt to perpetrate, arson, rape in the first degree, robbery, burglary, kidnapping, or mayhem, or sexual molestation of a child under the age of thirteen years, is murder of the first degree. All other kinds of murder are of the second degree.

*Id.* at 628 n.1 (quoting ARIZ. REV. STAT. ANN. § 13-1105.A (1989)). The jury instructions did not require the jury to make a unanimous finding on either of the available theories of premeditated murder or felony murder. *Id.* The Court, in *Schad*, first re-characterized the petitioner's claim. The Court found that the

issue was more properly characterized as a challenge to Arizona's definition of first-degree murder as a single crime. *Id.* at 630–31. That is, the petitioner's true contention was that "premeditated murder and felony murder are separate crimes as to which the jury must return separate verdicts." *Id.* at 631. The Court concluded that Schad's claim was "one of the permissible limits in defining criminal conduct, as reflected in the instructions to jurors applying the definitions, not one of jury unanimity." *Id.*

The Court noted that, generally, its "cases reflect a long-established rule of the criminal law that an indictment need not specify which overt act, among several named, was the means by which a crime was committed." *Id.* The Court recognized, however, that "there are limits on a State's authority to decide what facts are indispensable to proof of a given offense." *Id.* at 633. Rather than adopting a "single test for the level of definitional and verdict specificity permitted by the Constitution," *id.* at 637, the Court asked whether the state statute's specificity was consistent with the demands of due process and fundamental fairness and noted that rationality is an essential component of that fairness, *id.* Thus, the critical point is that "at which differences between means become so important that they may not reasonably be viewed as alternatives to a common end, but must be treated as differentiating what the Constitution requires to be treated as separate offenses." *Id.* at 633. Thus, in determining whether a specific statute meets these requirements, courts must

> look both to history and wide practice as guides to fundamental values, as well as to narrower analytical methods of testing the moral and practical equivalence of the different mental states that may satisfy the *mens rea* element of a single offense. The enquiry is undertaken with a threshold presumption of legislative competence to determine the appropriate relationship between

7

means and ends in defining the elements of a crime. *Id.* at 637. Thus, the *Schad* inquiry has two prongs: (1) whether history and current practice indicate that the statute reflects fundamental values, and (2) whether there is a moral equivalence between the two mental states that permits the statute to satisfy the *mens rea* element of a single offense through different mental states. *Id.* at 637–38; *Reed v. Quarterman*, 504 F.3d 465, 481–82 (5th Cir. 2007).

In *Reed*, we denied a COA to a petitioner's challenge to a capital murder jury instruction—which was nearly identical to the instruction Berkley received—based upon the Texas capital murder statute. 504 F.3d at 482. The capital murder jury instruction here read, "A person commits capital murder when such person intentionally causes the death of an individual in the course of committing or attempting to commit robbery, kidnapping, or aggravated sexual assault." In *Reed*, the defendant challenged a jury charge which provided that a defendant was guilty of capital murder under Texas law if

> the defendant did then and there intentionally cause the death of the complainant in the course of committing or attempting to commit robbery of the complainant or in the course of attempting to commit aggravated rape of the complainant.

*Id.* at 479–80. Considering the first *Schad* prong, we found that "numerous states have traditionally defined and continue to define first-degree or aggravated murder as including both a killing in the course of robbery and a killing in the course of rape or attempted rape." *Id.* at 482. In applying the second prong of the *Schad* inquiry, we held that "a court could reasonably find a moral equivalence between murder in the course of robbery and murder in the course of attempted rape." *Id.* at 482; *accord Richardson v. United States*, 526

U.S. 813, 818 (1999) (When the underlying offenses are but a means of proving a single element, "the jury need only agree that the defendant committed . . . the underlying crimes the Government has tried to prove. The jury need not agree about which [underlying crime was committed]."); *Rodriguez v. Texas*, 146 S.W.3d 674, 677 (Tex. Crim. App. 2004) (recognizing a moral equivalence between the various offenses that can be proven to support the "nature of conduct" element of capital murder). In *Reed*, we concluded that "reasonable jurists would not debate that the Texas court reasonably applied *Schad* when it rejected Reed's challenge to his jury instructions." *Id*. at 482.

This holding, denying a COA to a challenge to Texas's capital murder statute after finding that reasonable jurists could not dispute that *Schad* was properly applied, controls the instant case. Berkley's jury instruction was nearly identical to the jury instruction at issue in *Reed*. Accordingly, we hold that reasonable jurists could not debate that the district court correctly concluded that the Texas court properly applied *Schad* to this case. We therefore deny Berkley a COA on this issue.

## C. Lesser-Included Offense Instruction on Simple Murder

In his third claim for relief, Berkley asserts that the trial court erred in failing to instruct the jury on the lesser-included offense of simple murder, and that this omission is reversible error under *Beck v. Alabama*, 447 U.S. 625 (1980). Before proceeding to the merits of Berkley's claims, however, we must first consider whether Berkley has failed to exhaust this claim or is otherwise procedurally barred from raising the claim before this court. *Cf. Slack*, 529 U.S. at 485. Berkley's petition fails due to two procedural bars to his claim: (1) Berkley failed to exhaust his state court remedies, and (2) Berkley has

procedurally defaulted on his claim by failing to comply with state procedural rules.

Berkley failed to request a lesser-included-offense instruction during the guilt-innocence phase of his trial. He also did not challenge the failure to include the instruction during either his direct appeal or in his state habeas proceedings. Berkley candidly admits that this claim is unexhausted, but he argues on federal habeas review that the futility exception to the exhaustion requirement should excuse his failure to exhaust this issue in state court. The district court rejected Berkley's futility argument and held that it was "statutorily precluded" from granting federal habeas relief on Berkley's lesser-included offense claim because the claim was unexhausted.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, requires that federal habeas petitioners "exhaust[] the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). "The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court." *Morris v. Dretke*, 413 F.3d 484, 491 (5th Cir. 2005) (internal quotation marks and citation omitted). A federal habeas petitioner seeking review from a Texas state law conviction must have presented his claims to the TCCA. *See Richardson v. Procunier*, 762 F.2d 429, 431–32 (5th Cir. 1985). Lack of exhaustion may be excused, however, if he can demonstrate that the presentation of the claims to the state court "would be plainly futile." *Morris*, 413 F.3d at 492 (quoting *Graham v. Johnson*, 94 F.3d 958, 969 (5th Cir. 1996)).

In *Fisher v. Texas*, 169 F.3d 295 (5th Cir. 1999), we held that "the exhaustion requirement may be excused when seeking a remedy in state court

would be futile," *id.* at 303. "The futility exception applies when . . . the highest state court has recently decided the same legal question adversely to the petitioner." *Id.* In *Fisher*, we considered whether it would have been "futile" for a federal habeas petitioner to have argued to the state court a *Batson* claim premised on the exclusion of venire members based on their religious affiliation after the state court had rejected the merits of precisely such a constitutional claim. *Id.* We held in favor of the petitioner and considered the claim despite the petitioner's failure to present it first to the state court. *Id.* Thus, this court has recognized a futility exception when the highest state court has recently rejected a federal claim on the merits.

Unlike the petitioner in *Fisher*—in which a state court had rejected the petitioner's challenge to federal law on the merits—Berkley asks this court to apply the futility exception to excuse his failure to challenge a state's *procedural* law in state court. At trial, Berkley failed to object to the jury instructions; and under Texas' contemporaneous objection rule, this failure to object procedurally bars Berkley from pursuing this issue on appeal in state court. We have held repeatedly that "'[t]he Texas contemporaneous objection rule is strictly or regularly applied evenhandedly to the vast majority of similar claims, and is therefore an adequate [state] procedural bar.'" *Turner v. Quarterman*, 481 F.3d 292, 301 (5th Cir. 2007) (quoting *Dowthitt v. Johnson*, 230 F.3d 733, 752 (5th Cir. 2000)). As such, the contemporaneous objection rule "is an independent and adequate state ground for decision, precluding federal review." *Id.* at 300. Berkley never challenged this procedural bar in state court because, as he asserts, this challenge would have been futile because the TCCA had previously dismissed a challenge to a petitioner's conviction in a similar case. *See*

11

*Kinnamon v. Texas*, 791 S.W.2d 84, 96 (Tex. Crim. App. 1990) (en banc) (holding that the defendant's failure to request a jury instruction on the lesser-included offense of simple murder constituted a waiver of the objection), *overruled on other grounds by Cook v. Texas*, 884 S.W.2d 485 (Tex. Crim. App. 1994). However, this court has not yet addressed, much less recognized, a futility exception when the state court's decision rests upon a long-standing procedural rule that is an independent and adequate state law ground for denying recovery.

To do so here would deprive the state court the opportunity to address state law in the first instance and ignore the basic principles behind the exhaustion requirement. The exhaustion requirement "is grounded in concerns of comity and federalism." *Duncan v. Walker*, 533 U.S. 167, 179 (2001). It provides state courts the opportunity to address federal law in the first instance. Most importantly for our purposes, the exhaustion requirement also allows state courts to be the primary adjudicators of state law. *Id*. Thus, the doctrine is especially important when the state court review that the petitioner seeks to avoid is premised upon "'a state law ground that is independent of the federal question and adequate to support the judgment.'" *Rosales v. Dretke*, 444 F.3d 703, 707 (5th Cir. 2006) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)). Applying the futility exception to excuse a petitioner's failure to challenge a state procedural rule would subvert state court procedural rules and undermine the principles of finality, comity, and federalism underpinning our general requirement that a federal habeas petitioner must first present the substance of her challenge to the highest state court.

Thus, the futility exception does not apply to excuse a petitioner's failure to challenge in state court a state procedural rule that would be an independent

and adequate ground to support the judgment. Because reasonable jurists would not debate that the district court correctly concluded that this exception is not available to excuse Berkley's failure to make a contemporaneous objection to his jury instructions, we must deny Berkley a COA on this issue.

Even assuming that the futility exception applies to excuse Berkley's failure to exhaust, Berkley would still be barred by the procedural default doctrine. The procedural default doctrine is distinct from, though related to, the exhaustion doctrine. "A habeas petitioner who has [procedurally] defaulted his federal claims in state court [due to a state procedural rule] meets the technical requirements for exhaustion." *Coleman v. Thompson*, 501 U.S. at 732. However, "there are no state remedies any longer 'available' to him" because he has procedurally defaulted on those claims. *Id.* (citations omitted). "'Under the procedural default doctrine, a federal court may not consider a state prisoner's federal habeas claim when the [S]tate based its rejection of that claim on an adequate and independent state ground.'" *Coleman v. Quarterman*, 456 F.3d 537, 542 (5th Cir. 2006) (internal quotation marks and citations omitted). Even though the TCCA never considered Berkley's challenge to his jury instructions, the "State need not explicitly apply [a] procedural bar 'if the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred [under state law].'" *Beazley v. Johnson*, 242 F.3d 248, 264 (5th Cir. 2001) (quoting *Coleman v. Thompson*, 501 U.S. at 735 n.1). Because the contemporaneous objection rule is an independent and adequate state ground for decision, *see Turner*, 481 F.3d at 300, Berkley has procedurally defaulted this claim absent a demonstration of "cause for the

default and actual prejudice as a result of the alleged violation of federal law," *Ogan v. Cockrell*, 297 F.3d 349, 356 (5th Cir. 2002). *See Rowell v. Dretke*, 398 F.3d 370, 375 (5th Cir. 2005) (recognizing that Fifth Circuit case law forecloses review of challenges to a jury instruction to which a petitioner did not contemporaneously object absent a finding of cause and actual prejudice). Berkley concedes that the contemporaneous objection rule would have barred his claim in Texas state court and makes no argument that cause and prejudice exist to overcome the procedural default.

Because Berkley's claims are both unexhausted and procedurally defaulted, we deny Berkley a COA on this issue.

## D.     Burden of Proof on the Issue of Mitigation

In his fourth claim, Berkley asserts that his Sixth and Fourteenth Amendment rights were violated when the trial court failed to instruct the jury that it must find the absence of mitigating factors beyond a reasonable doubt. Berkley relies upon *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002), for his contention that any findings of facts that increase a defendant's punishment must be found by a jury beyond a reasonable doubt.

This court has rejected this same argument on at least three occasions. In *Granados v. Quarterman*, 455 F.3d 529 (5th Cir. 2007), we considered whether the Texas mitigation issue was "constitutionally flawed in that it does not require the State to prove beyond a reasonable doubt the absence of mitigating circumstances," *id.* at 536. We recognized that Texas requires all elements of capital murder to be proved beyond a reasonable doubt, including all factual findings that were prerequisites to the imposition of the death penalty.

*Id.* The court found that the State did not violate either *Apprendi* or *Ring* "by not asking the jury to find an absence of mitigating circumstances beyond a reasonable doubt in addition to questions it required the jury to answer," *id.*, because a "finding of mitigating circumstances reduces a sentence from death, rather than increasing it to death," *id.* at 537.

Applying the holding in *Granados*, we denied the petitioners in *Scheanette v. Quarterman*, 482 F.3d 815, 828–29 (5th Cir. 2007), and *Ortiz v. Quarterman*, 504 F.3d 492, 504–05 (5th Cir. 2007), a COA on the very question presented here. In both cases, we found that reasonable jurists would not debate the dismissal of the defendant's claim. *See Ortiz*, 504 F.3d at 505; *Scheanette*, 482 F.3d at 829.

Accordingly, we once again hold that reasonable jurists could not debate the propriety of the district court's dismissal. The "Texas death penalty scheme does not violate *Apprendi* or *Ring* by failing to require the State to prove beyond a reasonable doubt the absence of mitigating circumstances." *Ortiz*, 504 F.3d at 505. We therefore deny Berkley a COA on this issue.

## E.   Brady Claims

In Berkley's fifth and final claim, he argues that the prosecution violated his rights under *Brady v. Maryland*, 373 U.S. 83 (1963), by withholding: (1) the photo array containing a picture of Martinez's ex-boyfriend, Jose Hernandez ("Hernandez"), that was provided to witness Douglas Bosanko ("Bosanko"), and (2) information regarding Hernandez's then-pending indictment for leaving the scene of an accident. Berkley contends that the two pieces of withheld evidence would have shown that Hernandez was involved in Martinez's murder. Specifically, he asserts that he would have used the photo array to bolster

Bosanko's credibility, and that he would have used the pending indictment to challenge Hernandez's credibility on cross-examination.

Under *Brady*, the government may not withhold evidence that is favorable to a criminal defendant. *United States v. Walters*, 351 F.3d 159, 169 (5th Cir. 2003). "To establish a *Brady* violation, a defendant must show that (1) the prosecution suppressed evidence; (2) the evidence was favorable, such as exculpatory or impeachment evidence; and (3) the evidence was material." *United States v. Skilling*, __ F.3d __, 2009 WL 22879, at *34 (5th Cir. Jan. 6, 2009) (citing *Mahler v. Kaylo*, 537 F.3d 494, 499–500 (5th Cir. 2008)). "Where a defendant fails to establish any one element of *Brady*, we need not inquire into the other components." *Id.* at *34. Like the district court, we assume that Berkley has met the first two elements of *Brady*, and thus confine ourselves solely to determining whether the suppressed evidence was material.

The third element—materiality—"'is generally the most difficult to prove.'" *Id.* (quoting *Mahler*, 537 F.3d at 500). "In assessing materiality, we must determine whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* (internal quotation marks and citations omitted). To determine materiality, we must consider the four guideposts outlined by the Supreme Court:

> First, materiality does not require the defendant to demonstrate by a preponderance of the evidence that omitted evidence would have resulted in acquittal. Second, he need not weigh the withheld evidence against the disclosed evidence to show he would have been acquitted by the resulting totality. Third, if evidence is found material, there is no need to conduct a harmless error analysis. Fourth, the withheld evidence should be considered as a whole, not item-by-item.

*Id.* at *35 (quoting *DiLosa v. Cain*, 279 F.3d 259, 263 (5th Cir. 2002)). This court

16

has held that "[t]he sum of these four guideposts means that to show a due process violation when the [S]tate withholds evidence, a defendant need not prove that his trial necessarily would have had a different outcome; a lack of faith in the result is sufficient." *Id.* (alteration in original, internal quotation marks and citation omitted). Finally, "materiality depends largely on the value of the suppressed evidence relative to evidence that the government disclosed." *Id.* (citing *United States v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004)).

Berkley first asserts that the State violated *Brady* by failing to turn over a photo array that the police showed to defense witness Bosanko. The context of Bosanko's testimony, however, reveals that the suppressed photo array was immaterial. The jury heard evidence that Hernandez was at the scene of the crime when Martinez was killed. The defense called Bosanko, the owner of a wrecker and locksmith company, who testified that on the night of Martinez's murder he observed an unidentified person get out of a vehicle, similar to Martinez's vehicle, about twenty-five to thirty feet off of the highway. Sixty to eighty minutes later, Bosanko passed the same stretch of highway, but this time noted that the vehicle appeared abandoned. Continuing down the highway three to four miles, he observed a Hispanic male, with the same build as the man near the vehicle, pacing back and forth. Bosanko stopped to see if the man needed a ride. The Hispanic man said he was waiting for a friend to give him a lift so Bosanko left him on the highway.

Upon learning of Martinez's murder, Bosanko contacted the police department. He testified that the police made a composite sketch based upon his descriptions of the Hispanic male. Later, the police visited Bosanko at his home and showed him a photo array that included Hernandez's photo. According to

17

the written reports of the detectives and the testimony of El Paso Police Detective Jesus Pantoja, Jr. ("Det. Pantoja"), Bosanko was unable to identify anyone from the photo array. The defense received copies of these reports, but the actual photo array was not provided to the defense until after the jury had begun its deliberations.

Berkley has provided no argument suggesting how the photo array would have been beneficial to his case. He received copies of the detectives' reports that indicated that Bosanko had failed to identify anyone in the photo array. The jury was aware that the photo array existed and heard testimony from Bosanko that he was unable to identify anyone in the array. Most critically, Bosanko told the jury that he identified a man other than Berkley at the scene of the crime at approximately the time Martinez was murdered. Finally, the jury heard evidence that Bosanko later identified Hernandez in a one-on-one line-up at the police station. The jury was thus well aware of Bosanko's testimony placing Hernandez at the scene of the crime at the time that Martinez was killed. Thus, the actual photo array would have provided no additional value at trial, and Berkley fails to make any plausible suggestion to the contrary.

Berkley also contends that the State violated *Brady* by failing to disclose that Hernandez, a State rebuttal witness, was under indictment for leaving the scene of an accident. Hernandez was called to testify after a dispute arose regarding whether Bosanko identified him in a one-on-one line-up that the police conducted after Bosanko failed to identify anyone in the photo array. Bosanko testified that he identified Hernandez in the line-up as the man he had spoken with on the side of the highway the night of Martinez's murder. In addition,

18

Bosanko testified that he positively identified the voice of the man in the one-on-one line-up. In rebuttal of this testimony, the State called Det. Pantoja, who testified that Bosanko did not positively identify Hernandez. The State then called Hernandez, who testified that he participated in the line-up and that the police told him that he had been identified, but that he did not believe them. He further testified that he was at home with his girlfriend and his parents at the time that Martinez was killed and that he did not kill Martinez.

Berkley contends that had his trial counsel been aware of the pending charges, they would have shown Hernandez's testimony to be tainted by "bias, prejudice, and motive." *United States v. Collins*, 472 F.2d 1017, 1019 (5th Cir. 1972) (holding that "evidence of pending charges is admissible for the purpose of showing bias, prejudice, and motive of a witness"). Even assuming that evidence of his pending indictment would have been admissible as impeachment evidence, *see United States v. Abadie*, 879 F.2d 1260, 1266–67 (5th Cir. 1989), Berkley has failed to make out a *Brady* violation.

There is not a reasonable probability that the jury would have returned a different verdict based upon this evidence. Additional evidence suggesting that Hernandez's testimony was biased would not have lessened the impact of the overwhelming evidence of Berkley's guilt. Berkley provided a two-page written statement in which he confessed that he had approached Martinez's vehicle at the ATM. He further stated that his gun went off as he approached her, and that he then directed her to withdraw $200 and drive away from the ATM to a deserted area. Berkley stated that once they arrived at that location, "the girl" initiated multiple episodes of sexual relations; and that during one of those encounters, his gun "went off." He confessed that he passed out and that when

he awoke the woman was lying on the ground. He stated that he "freaked out" and drove her car to another part of the desert where he drove it off the road and walked home.

Two days after giving his first statement, Berkley provided a second statement in which he confessed that the murder weapon was a .22 caliber handgun that he had taken from his father, that his close friend Michael Jacques ("Jacques") had helped in the planning and execution of the robbery and the disposal of Martinez's car, and that he burned Martinez's driver's license in a barbeque grill.

The jury heard testimony from Jacques's estranged wife that she observed a set of car keys and a driver's license belonging to Martinez in her kitchen and that Martinez's driver's license was later burned in a barbeque grill. An El Paso Police officer confirmed her testimony, testifying that Martinez's car keys were discovered on the roof of the apartment building where Jacques and Berkley had resided in March, 2000. In addition, the prosecution presented evidence that police had discovered a .22 caliber handgun and ammunition inside a night-stand drawer in Berkley's parents' master bedroom. Finally, the jury heard testimony that Berkley's DNA matched the sperm fraction recovered from Martinez's vaginal swabs.

Cumulatively, the suppressed evidence does not undermine our confidence in the verdict. At most, the photo array and the pending indictment would have supported the defense's theory that Hernandez participated in Martinez's murder. However, the strongest evidence supporting that theory, Bosanko's testimony, was provided to the jury. There is not a reasonable probability that the jury would have returned a different verdict based upon the suppressed

20

evidence given the overwhelming evidence of Berkley's guilt before it. Accordingly, we hold that reasonable jurists would not debate that the Texas courts and the district court correctly concluded that the suppressed evidence was not material. We therefore deny Berkley a COA on this issue.

## IV. CONCLUSION

For the reasons stated above, we find that reasonable jurists could not debate the merits of any of Berkley's claims and DENY Berkley's Application for a Certificate of Appealability.

DENIED.